PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Greyhound Lines, Inc., Intervenor.

No. 83–2301.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1984.

Decided Dec. 5, 1984.

Robert J. Longwell, Harrisburg, Pa., with whom Charles F. Hoffman, Harrisburg, Pa., was on brief, for petitioner.

Dennis J. Starks, Atty., I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., John Broadley, Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., Robert B. Nicholson and John P. Fonte, Dept. of Justice, Washington, D.C., for U.S.

E. Barrett Prettyman, Jr., Washington, D.C., for intervenor Greyhound Lines, Inc.

Before WILKEY, WALD, and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge.

Section 16 of the Bus Regulatory Reform Act of 1982 (the "Bus Act" or "BRRA"), Pub.L. No. 97–261, 96 Stat. 1102, 1117 (codified at 49 U.S.C. § 10935), authorizes the Interstate Commerce Commission ("ICC" or "Commission") to let carriers discontinue unprofitable intrastate passenger service when specific "exit" conditions are met. In this proceeding, the Pennsylvania Public Utilities Commission ("PaPUC") challenges an ICC order authorizing Greyhound Lines, Inc. ("Greyhound") to terminate intrastate operations over twelve routes in Pennsylvania. PaPUC denied the discontinuance application in a prior state proceeding. We now affirm the Commission's decision concerning eleven of the twelve routes in question. With respect to the remaining route, we conclude that the ICC erroneously interpreted the Bus Act and failed to base its ultimate findings on a reasoned consideration of the policies underlying the statute. We therefore remand that portion of the ICC's order for further proceedings consistent with this opinion.

## I. THE BACKGROUND

This case concerns the continued availability of intrastate bus service to small communities. Specifically, we must determine whether the ICC correctly interpreted and applied the statutory standard governing the conditions under which large bus carriers may discontinue marginally unprofitable routes that provide the only available bus service to small communities. We survey the relevant sections of the BRRA and its legislative history before turning to the facts of this proceeding.

### A. Section 16 of the Bus Act

Under the pre-BRRA Interstate Commerce Act, Pub.L. No. 95–473, 92 Stat. 1337 (1978), a bus carrier that wished to terminate a route serving both interstate and intrastate passengers was required to seek discontinuance authority from both the ICC and the relevant state regulatory body. The state and federal proceedings were completely distinct and were governed by different statutes. See H.R.Rep. No. 334, 97th Cong., 1st Sess. 42 (1981) [hereinafter cited as *House Report*]. Section 16 of the Bus Act was designed to eliminate this dual system of regulation.

Under the BRRA, a carrier must still apply to the appropriate state authority for permission to discontinue intrastate service. *See* 49 U.S.C. § 10935(a). If the state regulatory authority denies a carrier's discontinuance request, or if the state does not act on the request within 120 days, the carrier can petition the ICC for discontinuance authority. *See id.* If no one objects to the petition before the ICC, the Commission must grant the discontinuance request. If any person objects to the proposed route termination, however, the Commission must consider the petition under the standard elaborated in section 16. *See* 49 U.S.C. § 10935(e)(1).[1]

■ The substance of this discontinuance standard engendered substantial dispute in Congress. Congress undoubtedly enacted section 16 in order to reduce unnecessary government regulation of intrastate service and to enhance the long-term viability of the intercity bus industry. *See, e.g.,* S.Rep. No. 411, 97th Cong., 2d Sess. 4–5, 7–8 (1982) [hereinafter cited as *Senate Report*]; *House Report* at 21–23, U.S.Code Cong. & Admin.News 1982, p. 2308. Yet Congress expressly rejected both the ICC's and the bus industry's entreaties that it completely deregulate intrastate bus carriage and permit carriers to discontinue intrastate service at will. *See, e.g.,* 128 Cong.Rec. H6694 (daily ed. Aug. 19, 1982) (statement of Rep. Clausen); 128 Cong.

Rec. S7714 (daily ed. June 30, 1982) (statement of Sen. Abdnor); 127 Cong.Rec. H8588–89 (daily ed. Nov. 19, 1981) (statement of Rep. Anderson); *id.* at H8589 (statement of Rep. Clausen); *cf. Trailways, Inc. v. ICC,* 727 F.2d 1284, 1288 (D.C.Cir. 1984). Instead, Congress took great pains to ensure that regulatory reform of the bus industry would protect the public interest in continued service to rural America. *See* H.R.Rep. No. 780, 97th Cong., 2d Sess. 47–50 (1982) [hereinafter cited as *Conference Report*]; *Senate Report* at 6–7; *House Report* at 27.[2]

■ These competing concerns spawned an initial, complex House version of section 16, a series of Senate amendments to that version, and a detailed compromise worked out in conference.[3] As enacted, section 16 provides, in relevant part, that the Commission "shall grant" a discontinuance request

> unless the Commission finds, on the basis of evidence presented by the person objecting to the granting of such permission, that such discontinuance or reduction is not consistent with the public interest or that continuing the transportation, without the proposed discontinuance or reduction, will not constitute an unreasonable burden on interstate commerce.

49 U.S.C. § 10935(e)(1)(A).[4] An objector can succeed under this section, and thereby

---

1. The Commission has the authority to consider an intrastate discontinuance request only if the carrier also seeks to terminate the interstate component of the route in question. *See* 49 U.S.C. § 10935(e)(3). It is undisputed that Greyhound meets this criterion for each of the routes involved in this case.

2. Indeed, nearly the entire congressional floor debate over the "exit" provisions of section 16 concerned the need to protect small communities from the effects of any industry-oriented "deregulation" or regulatory reform. Congress "gave special emphasis to the impact of . . . regulatory reform on small communities who depend on bus transportation as their only link of intercity passenger transportation," 127 Cong. Rec. H8589 (daily ed. Nov. 19, 1981) (statement of Rep. Clausen), and it is undeniable that a primary concern behind the Bus Act was the protection of rural bus service. *See Trailways,*

727 F.2d at 1292; *see also* 128 Cong.Rec. H6691 (daily ed. Aug. 19, 1982) (statement of Rep. Howard); *id.* at H6692–96 (remarks by several members of Congress assuring the House that section 16 requires the ICC to take specific steps to protect small communities); 128 Cong.Rec. S7709 (daily ed. June 30, 1982) (statement of Sen. Riegle); *id.* at S7710 (statement of Sen. Danforth); *id.* at S7712–19 (Senate debate on service to small communities); 127 Cong.Rec. H8589–94 (daily ed. Nov. 19, 1981) (House debate on service to small communities).

3. The legislative history of these versions is explored in greater detail in our discussion of the ICC's decision concerning Route 5–B. *See infra* pp. 851–53.

4. This standard applies to intrastate bus routes operated under licensing authority granted on or before August 1, 1982. *See* 49 U.S.C.

block route termination, if she can demonstrate *either* that discontinuing the service would be inconsistent with the public interest *or* that continuing the service would not constitute an unreasonable burden on interstate commerce.[5] This disjunctive interpretation of section 16 reflects Congress' unmistakable intent that the ICC evaluate a discontinuance request under two separate criteria and that an affirmative finding under either one require continued service. *See Conference Report* at 47–50; 128 Cong.Rec. H6694 (daily ed. Aug. 19, 1982) (noting that section 16 creates "an either-or test, with an affirmative finding in either case serving as grounds to deny the ... discontinuance") (statement of Rep. Clausen).[6]

Two additional provisions of the statute flesh out subsection 16(e)(1)'s alternative

discontinuance standards. *See* 49 U.S.C. § 10935(g). First, under subsection 16(g)(1), *id.* § 10935(g)(1), the Commission is directed to give "great weight to the extent to which" variable costs exceed intrastate and interstate revenues for the routes in question "in making a finding under subsection (e)(1)." The carrier bears the burden of proving that variable costs exceed revenues for any particular route. *See id.* Second, section 16(g)(2), *id.* § 10935(g)(2), provides that the Commission, "in making a finding under subsection (e)(1)," shall consider, to the extent applicable, the national transportation policy of 49 U.S.C. § 10101,[7] the carrier's actual or promised receipt of a subsidy, whether the route at issue is the last bus service to any point, and the availability of a reasonable alternative to such service.[8]

§ 10935(e)(1)(B). All of the routes at issue in this case were granted prior to that date.

5. Although a literal interpretation of subsection 16(e)(1) might suggest that the Commission must make "findings" only where the evidence compels a conclusion that discontinuance would be inconsistent with the public interest or that continuance would not constitute an unreasonable burden on interstate commerce, *see* 49 U.S.C. § 10935(e)(1) (the ICC "shall grant ... *unless* the Commission *finds* ..."), the provision nonetheless requires the Commission to consider, on the basis of an objector's evidence, whether these ultimate findings should be made and, of course, to make the subsidiary findings necessary for that purpose. Thus, once an objector presents evidence to support these findings, the Commission may not decline to consider whether the public interest and burden on commerce require continuance, and its failure to deny a discontinuance request where the evidence reasonably requires it to do so is reversible error. The burden of proof under section 16 always remains with an objector, but the Commission certainly must give reasons *why* the requested findings are inappropriate. Hence, while the Commission need not technically "find" the opposite of what an objector must establish under section 16 in order to deny continuance, it must adequately explain its conclusions concerning the public interest and burden on commerce whether it grants or denies a discontinuance application. Such explanations are the "findings" to which we refer throughout this opinion, and to which the statutory language and the legislative history of section 16 refer. *See id.* §§ 10935(g)(1), (g)(2) ("In making a finding under subsection (e)(1) ..."); 128 Cong.Rec. H6694 (daily ed. Aug. 19, 1982) (statement of Rep. Clausen).

6. At this point in the debate, Representative Clausen was technically comparing the original House version to the Senate amendments that would have made discontinuance somewhat easier. The "either-or" structure of the House bill, however, was retained in conference. *See Conference Report* at 50; 128 Cong.Rec. H6698 (daily ed. Aug. 19, 1982) (statement of Rep. Clausen) ("[T]he Senate had virtually no exit protection, and the House Committee held firm on this ... so we could sustain our position."); *see also infra* p. 852. Representative Clausen's description thus applies to the final version of section 16 as well.

7. The national transportation policy provides that, "in regulating transportation by motor carrier," the ICC should seek

to promote competition and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers and intrastate bus services; (F) provide and maintain commuter bus operations; (G) improve and maintain a sound, safe, and competitive privately owned motor carrier system ....

49 U.S.C. § 10101(a)(2).

8. In making a finding under subsections (e)(1) or (e)(2) of this section, the Commission shall consider, to the extent applicable, at least—

B. *The Proceedings in This Case*

On December 17, 1982, Greyhound filed an application with PaPUC to discontinue motorbus service on twelve routes and route segments in Pennsylvania. Notice of the proposed discontinuance was given to the relevant cities and towns,[9] and a Pa-PUC administrative law judge ("ALJ") held hearings on the application in Harrisburg, on April 15, 1983, and in Scranton, on April 21, 1983. *See Petition of Greyhound, Inc., for a Review of a Decision of the Pennsylvania Public Utility Commission Pursuant to 49 U.S.C. 10935*, No. MC-1515 (Sub-No. 339), slip op. at 2 (Oct. 25, 1983) [hereinafter cited as *ICC Decision*]. On May 2, 1983, the ALJ entered an opinion denying Greyhound's application under Pennsylvania law. *See id.*[10] Shortly thereafter, PaPUC accepted the ALJ's opinion and denied Greyhound's discontinuance application. *See id.* Greyhound thereupon petitioned the ICC under section 16 of the Bus Act for authority to discontinue service over the twelve routes.

After receiving objections from PaPUC and evidence from both parties, the ICC granted Greyhound's termination request in full on July 19, 1983. The Commission found that, with one exception, Greyhound had demonstrated that its variable costs exceeded revenues by a wide margin. *See ICC Decision* at 8–9. According this factor "great weight" as provided in section 16(g)(1), the Commission concluded that Pa-PUC could not demonstrate that the discontinuance of Routes 1–A through 5–A was inconsistent with the public interest as defined by the BRRA or that continuance would not constitute an unreasonable burden on interstate commerce. *See id.* at 10, 12–13. With respect to the remaining route, Route 5–B, the ICC concluded that Greyhound did not meet its statutory burden of demonstrating that variable costs exceeded revenues. The Commission nonetheless "inferred" a burden on interstate commerce from the very fact of Greyhound's petition, *see id.* at 11, and balanced this burden *against* the public interest in continued service. *See id.* at 11–12. The ICC then concluded that this "balance" favored discontinuance chiefly because, in its view, "a smaller carrier which may have lower operating costs may be able to provide service over this route profitably." *Id.* at 12.

■ On appeal, PaPUC broadly challenges the Commission's conclusions concerning the public interest in continued service and its evaluation of Greyhound's variable cost and revenue data for all of the routes at issue. Where Congress has delegated to an agency the task of making specific findings, our review is governed by the well-settled standards of the Administrative Procedure Act. The ICC's evidentiary conclusions can only be set aside if

(A) the national transportation policy of section 10101 of this title; (B) whether the motor common carrier of passengers has received an offer of, or is receiving financial assistance to provide the transportation to be discontinued or reduced from a financially responsible person (including a governmental authority); and (C) in the case of a petition to discontinue transportation to any point, whether the transportation is the last motor carrier of passenger service to such point and whether a reasonable alternative to such service is available.

49 U.S.C. § 10935(g)(2).

9. Greyhound published notice of its discontinuance application in general circulation newspapers serving the cities designated by PaPUC. It also placed an announcement of its application in the *Pennsylvania Bulletin,* an official statewide government publication circulated to the offices of every mayor and city council in the state. *See ICC Decision* at 2. Apparently through an oversight by PaPUC staff, Greyhound or both, Greyhound was not directed to publish notice of its proposed discontinuance in a general circulation newspaper in the Route 5–B area. *See id.*

10. Under Pennsylvania law, the carrier bears the burden of demonstrating that the balance of interests favors discontinuance; carriers may also be required to suffer losses on some intrastate routes if overall state profits are adequate. *See* Application of Greyhound Lines, Inc., No. A90801, F22, Mem.Op. at 14–15 (May 2, 1983), Joint Appendix ("J.A.") at 103a–104a (the ALJ opinion). The ALJ noted that Greyhound had presented a "close case" under this standard for some of the routes in question, but decided to resolve all doubts against the carrier because, in his view, the Bus Act made it more appropriate for the ICC to decide intrastate discontinuance cases. *See id.* at 15–19, J.A. at 104a–108a.

they are arbitrary or capricious, *see* 5 U.S.C. § 706(2)(A), or if they are unsupported by the record, *see id.* § 706(2)(E). *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). PaPUC also argues, however, that the ICC's interpretation and application of the section 16 standard to Route 5–B is inconsistent with the clear congressional intent behind the Bus Act. In this context, a reviewing court must first determine whether Congress expressed a clear intent, and, if so, must ensure that the agency has followed that intent. *See Chevron, U.S.A. v. Natural Resources Defense Council,* — U.S. —, 104 S.Ct. 2778, 2787, 81 L.Ed.2d 694 (1983).[11]

■ We affirm the Commission's findings and its grant of discontinuance authority for Routes 1–A through 5–A. We conclude, however, that the ICC's application of the section 16 standard to Route 5–B, where the carrier could not demonstrate that variable costs exceed revenues, is inconsistent with the clear congressional intent behind the Bus Act. Furthermore, we conclude that the Commission failed to articulate a rational basis for its evidentiary findings concerning Route 5–B. We therefore remand the Commission's decision permitting Greyhound to discontinue service on Route 5–B for further ICC proceedings consistent with this opinion.

## II. THE ICC'S INTERPRETATION AND APPLICATION OF THE BUS ACT

The Commission's decision to grant Greyhound's discontinuance request can be divided into two parts. In reviewing the application to terminate service on Routes 1–A through 5–A, the ICC essentially concluded that discontinuance was justified by the significant disparities between variable costs and revenues and by the existence of alternative service. *See ICC Decision* at 5–8, 10, 12–13. As the Commission itself noted, however, "Route 5–B presented more difficult issues," *id.* at 10, including a crucial issue of statutory interpretation.

### A. Routes 1–A Through 5–A

■ We believe that the Commission applied the correct statutory standard to these routes by explicitly declining to find either that continued service would not constitute an unreasonable burden on interstate commerce *or* that discontinuance would be inconsistent with the public interest as defined by the Bus Act. First, the Commission found that Greyhound had adequately demonstrated that its variable costs for these routes exceeded its revenues, in some cases significantly. *See ICC Decision* at 6–9. Accordingly, the Commission gave "great weight," *see* 49 U.S.C. § 10935(g)(1), to this factor in its assessment of whether PaPUC could make either of the two showings sufficient under section 16 to require continued service. *See ICC Decision* at 6. We agree with the Commission that the But Act creates a virtual presumption in favor of discontinuance when a carrier demonstrates that variable costs substantially exceed revenues. *See Conference Report* at 49–50;

---

**11.** PaPUC relies on *North Carolina v. United States,* 325 U.S. 507, 65 S.Ct. 1260, 1262, 89 L.Ed. 1760 (1945), for the proposition that the ICC's decision should be subject to heightened judicial scrutiny because it was promulgated under a federal preemption of a traditional state function, namely intrastate bus regulation. We believe that the *North Carolina* doctrine is not relevant to the exit provisions of the Bus Act. *North Carolina* involved a provision of the (pre-Staggers) Interstate Commerce Act that granted the ICC limited authority to preempt state regulation of intrastate rail rates *only* if the ICC found, after an elaborate hearing, that an intrastate rate "unjustly discriminated" against inter-

state commerce. *See id.* at 509–511, 65 S.Ct. at 1262–1263. Under the Bus Act, by contrast, Congress has itself declared that state regulation burdens interstate commerce and has itself preempted state regulation to the extent provided by the statute. *See Senate Report* at 7–11; *House Report* at 24–27. This difference alone renders the *North Carolina* standard inapplicable. *See, e.g., Commissioner of Transportation v. ICC,* 750 F.2d 163 at —— —— (2d Cir.1984); *cf. Utah Power & Light Co. v. ICC,* 747 F.2d 721, 736 & n. 19 (D.C.Cir.1984); *Kentucky Utilities Co. v. ICC,* 721 F.2d 537, 542–43 (6th Cir.1983).

128 Cong.Rec. H6694–95 (daily ed. Aug. 19, 1982) (statement of Rep. Clausen). The ICC can therefore consider this statutory factor in making both of the findings required by section 16. *See Auville v. ICC*, 747 F.2d 179 at 184–85 (4th Cir.1984).

■ The ICC also explicitly considered the additional statutory factors—the national transportation policy, the promised or actual receipt of subsidies and the availability of alternative transportation—with respect to each of these routes. *See* 49 U.S.C. § 10935(g)(2). After noting that Greyhound had not received a firm offer of subsidy, it specifically found that discontinuance would not be inconsistent with the public interest in view of the low ridership, the insubstantial public opposition, or the actual availability of alternative service for the affected communities.[12] The Commission thus concluded that PaPUC could not satisfy either of the two section 16 criteria for Routes 1–A through 5–A.

■ PaPUC raises a series of objections directed at the ICC's consideration and evaluation of Greyhound's financial evidence and PaPUC's public interest evidence concerning these routes. The Commission's findings on these matters ordinarily must be accepted by a reviewing court unless arbitrary or capricious or unless unsupported by substantial evidence. *See, e.g., Ralston Purina Co. v. Louisville & Nashville RR*, 426 U.S. 476, 477–78, 96 S.Ct. 2160, 2161, 48 L.Ed.2d 781 (1976); *Trailways, Inc. v. ICC*, 673 F.2d 514, 517 (D.C.Cir.), *cert. denied*, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982). Given this deferential standard of review, we believe that only two of PaPUC's objections concerning these routes require comment.

First, PaPUC suggests that the ICC erred in determining that Greyhound had met its burden of proof on the variable cost/revenue factor because Greyhound's data was systemically inaccurate. In particular, PaPUC challenges (1) Greyhound's methodological assumption that off-route revenues should not be included in calculating on-route revenues, (2) its use of a one week traffic study in February to project yearly revenues and (3) its inclusion of certain items as variable costs. The petitioner further suggests that the Commission's acceptance of Greyhound's revenue projections for Routes 1–A through 5–A was arbitrary in light of its refusal to accept the same type of revenue projection for Route 5–B.

The Commission, however, did not accept the challenged data uncritically or without an appreciation of the carrier's underlying methodology. It noted that Greyhound had exhaustively explained its methodology and that the ICC had considered in detail and approved this methodology in prior discontinuance petitions. *See ICC Decision* at 6–8. In response to PaPUC's objections, moreover, the ICC determined that variable costs so far exceeded revenues for these routes as to render any systemic or statistical inaccuracy harmless error, *see id.* at 7–8, and that Greyhound's variable cost analysis was on the whole reasonable and consistent with ICC practice. *See id.* at 9. Finally, the Commission based its rejection of Greyhound's Route 5–B data on the unusual characteristics of that route and on the relatively small difference between revenues and variable costs according to Greyhound's evidence. *See id.* at 8. We cannot conclude that the Commission's variable

---

**12.** Specifically, the ICC found little or no public opposition to the elimination of Routes 1–A, 1–B, 1–C and 2. *See ICC Decision* at 10, 12. The evidence concerning Routes 3–A, 3–B and 3–C revealed alternative service from one of Greyhound's competitors and weekday service from several local transit companies. *See id.* at 13. Similarly, the Commission noted both the small ridership on Routes 4–A, 4–B and 4–C and the insubstantial public opposition to their discontinuance. The proposed discontinuance of Route 4–A provoked some public protest, but

the evidence revealed that ridership was low and that alternative weekday service was available. *See id.* at 10. Finally, the termination of Route 5–A drew no public opposition and rail commuter service was available over the only portion of the route affected by the proposed abandonment. *See id.* The Commission, of course, enjoys substantial discretion in weighing this evidence. *See, e.g., Trailways, Inc. v. ICC*, 673 F.2d 514, 517 (D.C.Cir.), *cert. denied*, 459 U.S. 682, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).

cost and revenue findings were arbitrary or unsupported by the evidence. *See Auville*, 747 F.2d at 183–84 (concluding that substantial evidence supports the ICC's variable cost and revenue conclusions in the face of similar methodological challenges).

Subsection, PaPUC contends that the ICC arbitrarily failed to evaluate evidence of a possible state subsidy. In support of this claim, PaPUC cites a letter from the Pennsylvania Department of Transportation informing Greyhound of the state's subsidy program and notifying the carrier that it should apply promptly for fiscal year 1983–84 operating assistance. *See* Letter to Warren May from William Parkin (May 12, 1983), J.A. at 254a.

█ Section 16(g)(2)(B) of the Bus Act, 49 U.S.C. § 10935(g)(2)(B), requires the ICC to consider whether a bus carrier "has received an offer of or is receiving financial assistance." The Commission's implementing regulation further provides that

> Any financially responsible person who intends to offer an operating subsidy or financial assistance to the carrier to enable it to continue providing the service which is proposed to be discontinued or reduced must notify the Commission and the carrier within 50 days after the petition is filed. This notification must indicate the amount of the subsidy or assistance being offered and demonstrate the financial responsibility of the person making the offer.

49 C.F.R. § 1169.25 (1984). PaPUC concedes that the state's invitation to Greyhound to solicit a subsidy does not fall within this regulation. *See* Brief for Petitioners at 37. Neither the Bus Act nor its legislative history, in turn, explicitly defines "offer of ... financial assistance." In this context, we must accept the agency's interpretation if it "is based on a permissible construction of the statute," *Chevron*, 104 S.Ct. at 2782. PaPUC has not

pointed to any reason why the regulation is impermissible in light of the BRRA's underlying policies. We therefore find that the ICC did not act unreasonably by refusing to credit the state's invitation to solicit a subsidy in considering Greyhound's discontinuance application.[13]

In sum, we conclude that, with respect to Routes 1–A through 5–A, the Commission applied the correct statutory standard, based its findings on the proper factors and substantial evidence, and reasonably weighed the evidence to conclude that discontinuance was warranted.

## B. *Route 5–B*

The ICC's consideration of Route 5–B, by contrast, raises substantial issues of statutory interpretation and rational decision-making. The Commission first concluded that Greyhound did not adequately demonstrate that its variable costs exceed revenues for this route. *See ICC Decision* at 11. The Commission opined that Greyhound's failure to prove a disparity between variable costs and revenues simply meant that the ICC need not give great weight to this factor. *See id.* Yet the ICC went on to infer *"some* burden" on interstate commerce from the very existence of Greyhound's petition, reasoning that the carrier's exit request indicates "that the resources committed to this route could be used more efficiently elsewhere." *Id.* (emphasis in original). The ICC did *not* rule that this "inferred" burden was alone sufficient to prevent it from finding that continued service would not constitute the *unreasonable* burden on interstate commerce at issue in section 16 proceedings.

Turning to the second or "public interest" standard the ICC similarly noted that "there is little evidence of a public interest in maintaining service," *id.*, despite the fact that the discontinuance would leave several communities without public transportation.

---

**13.** At one point in its decision, the Commission asserts that the absence of subsidies "belies the asserted interest in maintaining the involved unprofitable services and makes it difficult to conclude that public interest requires mainte- nance." *ICC Decision* at 9–10. The existence of a subsidy offer, of course, is only one of the statutory public interest factors. *See supra* note 8.

It did *not*, however, explicitly find that discontinuance would or would not be consistent with the public interest as defined by section 16. Instead, the Commission proceeded to *conflate* the two separate inquiries mandated under section 16 by "weigh[ing] this burden [on interstate commerce] against the public interest in maintained service in order to determine whether the burden is undue." *ICC Decision* at 11. In the Commission's words, "[w]e must exercise our discretion in balancing the apparently limited public interest in maintaining service against the burden on interstate commerce." *Id.; see also id.* at 9. The ICC eventually determined that the crucial factor in this "balancing test" was the possibility that a hypothetical low-cost carrier could serve the communities faced with a loss of transportation. *Id.* at 12.

The ICC's consideration of Route 5–B is flawed in two respects. First, the Commission's balancing test is inconsistent with Congress' clear intent that the ICC consider two quite separate issues before granting a carrier's discontinuance request. Second, the Commission's subsidiary findings concerning the burden on in-

terstate commerce and the availability of alternative service do not reflect a reasonable accommodation of the policies underlying the Bus Act.[14]

1. *The ICC's interpretation of section 16 in considering Route 5–B.* Each party in this case urges a different interpretation of section 16 in the context of Route 5–B. PaPUC argues that Congress intended the "great weight" directive of subsection 16(g)(1) to be the primary guide only in determining whether continued operations would unreasonably burden interstate commerce. Under this reading, only the factors elaborated in subsection 16(g)(2) would be considered in making the distinct, alternative public interest determination. Both the ICC and intervenor Greyhound suggest that the Commission is free to consider all of the criteria set out in subsections 16(g)(1) and 16(g)(2) in making both the burden on commerce *and* the public interest determination. The ICC, of course, adds the further argument that the statute permits the Commission to weigh the public interest in continued service *against* the resulting burden on interstate commerce.[15]

14. PaPUC also contends that the discontinuance of Route 5–B was improper because the affected communities did not receive the precise notice arguably required in the *state* exit proceeding. At least in part through a PaPUC staff oversight, Greyhound did not publish its discontinuance application in a general circulation newspaper in the Route 5–B area. *See supra* note 9. It is undisputed, however, that the affected communities received proper notice under the Bus Act concerning Greyhound's *federal* discontinuance request. Section 16 of the BRRA provides that the carrier shall certify that he has notified (1) the Governor of the State in which such transportation is provided, (2) the State authority having jurisdiction over granting discontinuances of transportation by motor common carriers of passengers and reductions in levels of service by such carriers, (3) local governments having jurisdiction over areas which would be affected if such petition is granted, and (4) such other interested persons as the Commission may specify by regulation. 49 U.S.C. § 10935(b). Greyhound met this requirement, *see ICC Decision* at 6, and the lack of any additional notice that may have been required under state law for a *state* proceeding is not cause for reversing the ICC. The Commission also found that PaPUC was responsible for any notice problem and that

citizens of the affected communities were afforded actual notice of the state proceedings. Indeed, several letters of protest were filed in the state proceeding. Before the ICC, PaPUC *chose* to rely on these letters rather than developing additional public interest evidence concerning Route 5–B as it was free to do under Commission regulations. *See* 49 C.F.R. § 1169.-22(d) (1984) (permitting objectors to file with the ICC verified statements in protest of a proposed discontinuance).

15. The Commission also urges that the ICC's interpretation of its governing statute is entitled to great deference. The ICC's application of the Bus Act to Route 5–B, however, raises a question of legislative intent properly resolved by the courts and not the agency. *See supra* p. 847.

Moreover, courts ordinarily defer to an agency's interpretation of a statutory "standard of such inherent imprecision ... that a discretion of almost legislative scope was necessarily implicated," *Ass'n of Data Processing Serv. Orgs. v. Board of Governors of the Federal Reserve System,* 745 F.2d 677 at 697 (D.C.Cir.1984), or when the agency presents the court with a contemporaneous or longstanding interpretation, *see Center for Auto Safety, Inc. v. Ruckelshaus,* 747 F.2d

The statutory language supports *part* of the ICC's interpretation. Subsections 16(g)(1) and 16(g)(2) both refer to an ICC "finding under subsection (e)(1)" which arguably embraces both the public interest and the burden on commerce findings. *Cf. Auville*, 747 F.2d at 184–85 (holding that the Commission can give "great weight" to the disparity between variable costs and revenues in making both findings). Representative Clausen's description of the conference bill also lends support to this interpretation:

·The conference substitute also provides that, in making its public interest and burden-on-commerce determinations with respect to reduction or continuance of existing service, the Commission shall give great weight to the extent to which the revenues derived from the service in question are less than the variable costs of providing the service.

128 Cong.Rec. H6695 (daily ed. Aug. 19, 1982).

■■■■ Although we agree that the "great weight" factor can apply to both findings required by section 16, *see supra* p. 847, this interpretation does *not* authorize the ICC to weigh the public interest in maintained service *against* the burden on interstate commerce. In our view, the legislative history of the Bus Act and resulting structure of section 16 unmistakably indicate that Congress intended the ICC to make distinct public interest and financial burden findings before granting a carrier's discontinuance application. Congress enacted this requirement, moreover, precisely because it believed that delegating unstructured deregulatory discretion to the ICC would not sufficiently protect the interests of small communities such as those served by Route 5–B.

The original House version of section 16 did not include any reference to the disparity between variable costs and revenues; instead it directed the Commission to make a public interest and a burden on commerce determination by reference to the factors listed in the current subsection 16(g)(2). *See House Report* at 10–11, 43; *Conference Report* at 47–48. By omitting any reference to variable costs, the House bill thus accorded somewhat more protection to small communities than the statute eventually passed. The Senate amended this version to require, in effect, that the ICC authorize discontinuance unless it would be inconsistent with the public interest *and* the route's revenues were adequate to cover variable costs. *See Senate Report* at 26–27, 62–63; *Conference Report* at 49–50.[16] As Representative Clausen explained:

---

1 at 5 (D.C.Cir.1984). Neither condition is present here. First, as we discussed above, Congress expressly rejected a broad delegation of discontinuance discretion to the ICC in favor of a detailed and structured statutory standard. *See supra* pp. 844–45. While some of the individual *elements* of that structure (*e.g.,* "public interest" or "unreasonable burden") may be "inherently imprecise," the structure itself, which is what is at issue here, is assuredly not. Second, shortly after the Bus Act went into effect, the ICC adopted (though later reversed) precisely the interpretation of section 16 advanced by PaPUC in this case. *See* Petition of Virginia Stage Lines, Inc. for Review of a Decision of the West Virginia Public Service Commission Pursuant to 49 U.S.C. 10935, No. MC–59239 (Sub.-No. 74) (ICC Sept. 9, 1983), *rev'd on reconsideration,* (ICC Mar. 23, 1984), *aff'd sub nom. Auville v. ICC,* 747 F.2d 179 (4th Cir.1984). In 1983, the Chairman of the ICC likewise indicated to a congressional oversight committee that the Commission was applying a substantially different interpretation of section 16 than it advances in this case. *See Bus Regulatory Reform Act of 1982: Hearing Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science and Transportation,* 98th Cong., 1st Sess. 20–23 (1983) (discussing the *Virginia Stage Lines* case).

16. The Senate version of section 16 provided, in relevant part:

the Commission shall grant such permission unless the Commission finds, on the basis of evidence presented by the person objecting to the granting of such permission, that such discontinuance or reduction is not an unreasonable burden on interstate commerce. For the purposes of this subsection, continuance of the transportation would not constitute an unreasonable burden on interstate commerce only if discontinuance or reduction of such service is not consistent with the public interest *and* the interstate and intrastate revenues from such service are adequate to cover the variable costs of operating the service proposed to be discontinued or reduced.

In the simplest shorthand terms, the Senate test said that if you are a carrier and you are losing money—any money on a route—you are out. The House test said that either the public interest or the absence of an unreasonable burden on interstate commerce—which I translate as excessive losses—could keep you in.

128 Cong.Rec. H6696 (daily ed. Aug. 19, 1982).[17]

In conference, Congress struck a compromise between these positions by (1) requiring *two,* disjunctive findings by the ICC (a public interest finding largely directed at the effect of discontinuance on small communities, *and* a burden-on-commerce finding largely directed at profitability), and (2) directing the Commission to give great weight to the variable cost factor in making these findings. *See Conference Report* at 50. Congress expressly declined to issue a blank deregulation check to the Commission; instead, it required considera-

tion of two distinct statutory standards in order to make it more difficult for carriers to abandon small communities, especially if a carrier could cover or nearly cover its variable costs. *See, e.g.,* 128 Cong.Rec. H6694–95 (daily ed. Aug. 19, 1982) (statement of Rep. Clausen) (noting that the final version of section 16 retains the House test's protection of small communities); *id.* (statement of Rep. Shuster); 127 Cong.Rec. H8588–89 (daily ed. Nov. 19, 1981) (statement of Rep. Anderson); *id.* (statement of Rep. Clausen); *cf. Trailways,* 727 F.2d at 1288. The resulting provision undeniably constrains the ICC's discretion to balance "all relevant considerations" by enumerating precise statutory factors to be considered in a discontinuance request.

"Balancing" the public interest and financial burden standards *against one another* disregards this carefully devised regulatory scheme.[18] Indeed, the Commis-

---

*Senate Report* at 62–63 (emphasis added). Under this section, an objector would be required to demonstrate *both* an inconsistency with the public interest and that revenues covered variable costs with respect to the challenged route. This standard was rejected in conference in favor of the original House version which allows an objector to prove either an inconsistency with the public interest or the lack of an unreasonable burden on interstate commerce. *See infra* p. 852.

**17.** The Senate amendments provide some support for PaPUC's view that the variable cost factor was intended to define only the unreasonable burden on commerce prong of the section 16 standard. The conference report states:

In defining what constitutes an unreasonable burden on interstate commerce, the Senate amendment provides that the intrastate and interstate revenues must be adequate under reasonable pricing practices to cover the variable costs of providing the transportation. *Conference Report* at 49, U.S.Code Cong. & Admin.News 1982, p. 2360; *see also* 128 Cong.Rec. H6692 (daily ed. Aug. 19, 1982) (statement of Rep. Anderson noting that the addition of the variable cost test in the conference report "clarifies the financial burden test on carriers"). We agree with the Commission, however, that the plain language of the statute and the relevant legislative history make clear that the "great weight" directive of subsection 16(g)(1) applies to both section 16 findings and indicates a congressional presumption in favor of discontinuance when a carrier demonstrates significant

variable cost/revenue disparities. *See Conference Report* at 50; *see also supra* p. 847.

**18.** On appeal, the Commission suggests that the internally inconsistent goals of the national transportation policy, 49 U.S.C. § 10101, *see supra* note 7, "inevitably require[ ]" a balancing of the factors favoring discontinuance against those favoring maintained service. Brief for Respondents at 23–24. Because Congress directs the Commission to consider the national transportation policy, the ICC argues, "the balancing test was entirely proper." *Id.* We find this argument unpersuasive for two reasons. First, the ICC's actual decision in this case is plainly predicated on a balance of the two central *section 16* findings against one another. *See supra* p. 850.

Second, Congress intended the public interest component of section 16 to provide more specific protection to small communities than the component of the national transportation policy which generally directs the ICC to "provide and maintain service to small communities." 49 U.S.C. § 10101(a)(2)(G). As Representative Anderson explained:

[T]he ICC ... must look at the national transportation policy ... [which] has a goal providing the providing and maintaining of service to small communities .... We included a more specific provision [in section 16]. The exit policy requires that in exit, the ICC must determine whether the exit being sought is the last bus and, in addition, whether or not there is reasonable alternative service.

sion's interpretation of section 16 in the Route 5–B context tends to establish the unstructured deregulatory discretion that Congress rejected as inconsistent with the needs of small communities. As it did in considering Route 5–B, for example, the Commission can acknowledge "some" public interest in continued service and "some" financial burden, but never rule on whether an objector has demonstrated either that discontinuance would be inconsistent with the public interest or that continued service would be an unreasonable burden on interstate commerce. By balancing both, the Commission succeeds in explicitly deciding neither. Congress' repeatedly expressed concern about the effects of ICC decision-making in this area demands a more accountable set of findings. As the court commented in *Trailways*, the Commission's "end-run around the regulatory scheme would permit the carrier to contravene a primary concern of the congressional sponsors of [the Bus Act]—continuance of service to small communities." *Trailways*, 727 F.2d at 1292 (citing legislative history).

Accordingly, we hold that, in proceedings under section 16 of the Bus Act, the ICC is required to determine explicitly whether an objector has established that the proposed discontinuance is inconsistent with the public interest *and* whether he has established that continued service would constitute an unreasonable burden on interstate commerce. If a carrier can demonstrate that its variable costs exceed revenues for the route(s) at issue, the Commission is free to accord this factor "great weight" in making either finding. The ICC is not, however, authorized to circumvent the statutory scheme and Congress' intent to protect small communities by balancing the two criteria against one another.

I think the question of [small town protection] is addressed in a more direct manner in section 16.

127 Cong.Rec. H8591 (daily ed. Nov. 19, 1981). Greyhound's service over Route 5–B, of course, constituted the last available public transportation for several of the affected communities. *See supra* p. 849. Accordingly, even if the ICC

■ *2. The ICC's "findings" with respect to Route 5–B.* The pitfalls that Congress sought to avoid by requiring the Commission to undertake two specific inquiries are dramatically illustrated by the ICC's somewhat cavalier assessment of the relevant statutory considerations with respect to Route 5–B. As we noted above, the Commission did not specifically find that requiring Greyhound to continue service along Route 5–B would constitute an unreasonable burden on interstate commerce. *See supra* pp. 849–50. Instead, it merely inferred "some burden" from the very fact of Greyhound's petition.

> [W]e may legitimately infer that requiring continued service would impose at least *some* burden on interstate commerce from the very fact that Greyhound desires to discontinue. This indicates that Greyhound finds that revenues on this route do not meet full economic costs (including opportunity costs), and that the resources committed to this route would be used more efficiently elsewhere. There is also a cross-subsidy when fixed costs are not covered.

*ICC Decision* at 11 (emphasis in original). In the course of its BRRA deliberations, Congress was certainly concerned about the effects of cross-subsidies on the long term health of the bus industry. *See, e.g., Senate Report* at 7–8. Nonetheless, Congress explicitly rejected the position that a carrier should be able to discontinue intrastate service upon request, *see supra* p. 844, and instead required the ICC to consider whether continuance would not constitute an *unreasonable* burden on interstate commerce. Whatever inferences the Commission might draw from the bare existence of an exit petition, a simple carrier request cannot suffice to support this required finding where, as here, an objector

were merely balancing the national transportation policy factors, its conclusions could not suffice as an explicit finding under subsection 16(e)(1)'s public interest standard which requires the *additional* consideration of the availability of alternative transportation to communities faced with a loss of service.

854

has submitted evidence that the carrier can cover its variable costs.

■ Similarly, the Commission did not explicitly reject the contention that discontinuing Route 5–B would be inconsistent with the public interest as defined by the Bus Act. PaPUC submitted largely undisputed evidence that terminating this service would leave all but one of the points served by Route 5–B without bus service. *See Objections of PaPUC to Greyhound's Petition for Permission to Discontinue Bus Service in Pennsylvania* 13–16, 35 (Aug. 16, 1983), J.A. at 169a–171a, 191a, 257a–271a; *see also ICC Decision* at 9, 11–12 (noting that some communities will lose the last available bus service). Congress, in turn, unmistakably intended that the loss of the last available bus service weigh substantially against discontinuance. *See, e.g.,* 127 Cong.Rec. H8591 (daily ed. Nov. 19, 1981) (statement of Rep. Rahall). The Commission nonetheless "found" that this statutory factor was overriden by the purely *hypothetical* availability of an alternative carrier.

> Given the evidence that Greyhound has been able to come at least fairly close to covering its opportunity costs, and given the fact that Greyhound is a relatively high cost carrier, we believe it is likely that a smaller carrier which may have lower operating costs may be able to provide service over this route profitably. If this should result, it will permit the various goals of the National Transportation Policy to be met simultaneously. Service would be maintained, the burden on interstate commerce would be ended, a variety of service would be provided which would be appropriate to the demands and requirements of this particular market, and equipment energy resources would be used more productively and efficiently.

*ICC Decision* at 12.

We note that this finding was not merely *part* of the basis for the Commission's decision, but was the *ultimate* ground for rejecting PaPUC's contention that discontinuance of Route 5–B would be inconsistent with the public interest.[19] We further note that the Commission did not determine that servicing of the route by another carrier *would* occur, or even *would be likely* to occur. The ICC merely deemed it "likely" that a small carrier "may have lower operating costs" and "may be able" to serve this route profitably. Surely the public interest finding required under section 16 cannot be met by the ICC's speculative "belief" that a low cost carrier might someday provide alternative bus service to the affected communities. Section 16 directs the Commission to consider the availability of "a *reasonable* alternative to [discontinued] service," 49 U.S.C. § 10935(g)(2)(C) (emphasis added), not a hypothetical alternative. *See, e.g.,* 127 Cong.Rec. H8591 (daily ed. Nov. 19, 1981) (statement of Rep. Rahall). Even if the Commission had said that a low-cost carrier *will* be able to provide service over this route profitably, this, without more, could not constitute the finding that alternate service was available, or was at least likely to become available, which would suffice to conclude the public interest inquiry. And since such a finding has not been made here, we need not consider the adequacy of evidentiary support for it.

We do, however, harbor substantial doubt that the probability of alternative service can be deduced from the single datum that a high-cost carrier approaches profitability without any studies or evidence showing that low-cost carriers in fact provide service over equivalent routes discontinued by high-cost carriers. In this case, for instance, the ICC predicated its alternative carrier scenario on a finding that Greyhound was "almost" able to cover its variable costs on Route 5–B. Perhaps a lower cost carrier, the Commission reasoned, could swing a profit on the route. Under this reasoning, a high cost carrier

---

**19.** The Commission, of course, never *explicitly* rejected PaPUC's contention thanks to its "balancing" trick.

will *always* be able to secure a discontinuance. If it can show *substantial* losses, the Commission will presumably grant the request, giving "great weight" to the variable cost/revenue disparity. If it suffers *minimal* or *no* losses on the particular route, the Commission can argue as it did here that a carrier's discontinuance petition itself indicates a burden on interstate commerce and that the public interest will be served by discontinuance because some other carrier might be able to service the route more efficiently. Congress could not have intended that small communities be deprived of public transportation through such a shell game.

 Notwithstanding its concern with the economic soundness of the bus industry, Congress went to great length to ensure that the public interest in bus service to small communities would not be sacrificed to a carrier's bare assertion that it could make higher profits elsewhere. Indeed, almost all of the congressional debates over section 16 concerned the extent of protections given to small communities. *See supra* note 2. As Representative Anderson explained:

> [T]he intent of this bill is to insure that the public interest test has an equal emphasis with economic considerations and the ICC interpreting otherwise would be a regulatory charade. The act does not create, and the Public Works and Transportation Committee would not condone, such a charade.

127 Cong.Rec. H8591 (daily ed. Nov. 19, 1981).[20] In our view, the ICC's alternative carrier scenario constitutes just such a charade. In order to make the appropriate public interest finding, the ICC may not have to identify presently existing alternative transportation in all cases or establish

to a certainty that alternative transportation will appear. The Commission surely cannot, however, satisfy section 16 by merely invoking the possibility that another carrier might arrive on the scene. *Cf. Rettig v. PBGC,* 744 F.2d 133, 154–55 (D.C.Cir. 1984). Accordingly, we hold that the ICC's speculation that a low-cost carrier might be able to service Route 5–B efficiently cannot satisfy the required section 16 finding that discontinuance would not be inconsistent with the public interest.

In sum, we conclude that, in addition to the Commission's failure to apply the correct statutory standard to Route 5–B, its meager findings with respect to that route are arbitrary and do not constitute "a reasonable accommodation of conflicting policies ... committed to the agency's care by statute." *Chevron,* 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

### III. CONCLUSION

For the foregoing reasons, we affirm the Commission's order authorizing Greyhound to discontinue service along Routes 1–A through 5–A. With respect to Route 5–B, however, we conclude that the ICC erroneously interpreted the Bus Act and that its findings were not the product of a reasoned decisionmaking process. We therefore remand that portion of the ICC's order for further consideration consistent with this opinion. On remand, the ICC must consider the two, distinct findings required under section 16 of the Bus Act—whether discontinuing the service will be inconsistent with the public interest and whether continuing the route will not unreasonably burden interstate commerce—before grant-

---

**20.** Representative Anderson's remarks referred to the House bill, but both the language and the structure of the House version were retained in conference. The additional "great weight" directive only applies if a carrier can demonstrate that variable costs exceed revenues. *See Conference Report* at 50, U.S.Code Cong. & Admin. News 1982, p. 2361 (noting that the conference substitute retains the "House bill, except that ... the Commission must give great weight to the

extent to which the carrier's interstate and intrastate revenues on the route to be discontinued are less than the variable costs of providing the transportation ...."). Greyhound, of course, could not establish the variable cost factor for Route 5–B; accordingly, the House test—and Representative Anderson's remarks—apply to the Commission's consideration of that route. *See also supra* note 6.

ing Greyhound's exit application. The ICC must adhere to the congressional intent behind the Bus Act and base these two findings on evidence in the record documenting the existence of the relevant statutory factors.

*So ordered.*