The STATE CORPORATION COMMIS-SION OF the STATE OF KANSAS, Keith R. Henley, Chairman, Rich Kow-alewski, Commissioner, and Margalee Wright, Commissioner, as constituent members, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-SION and the United States of America, Respondents, Greyhound Lines, Inc., Intervenor.

No. 90–9502.

United States Court of Appeals, Tenth Circuit.

Submitted on the Briefs.*

Decided May 13, 1991.

---

* The parties to this appeal have indicated that oral argument is not desired. After examining

828

Frank A. Caro, Jr., Gen. Counsel, and Charles V. Garcia, Asst. Gen. Counsel, Topeka, Kan., for petitioner.

James F. Rill, Asst. Atty. Gen., Robert B. Nicholson and John P. Fonte, Dept. of Jus-

tice, Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Michael Martin, I.C.C., Washington, D.C., for respondents.

Before BALDOCK, BARRETT and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

The State Corporation Commission for the State of Kansas ("KCC") seeks review of an order issued by the Interstate Commerce Commission ("ICC") granting Greyhound Lines, Inc. ("Greyhound") permission to discontinue bus service over three routes in Kansas. We have jurisdiction pursuant to 28 U.S.C. §§ 2321(a) and 2342(5).

## I.

Prior to 1982, a bus carrier had to file discontinuance requests with both the ICC and the appropriate state regulatory commission when the carrier wanted to discontinue a route over which it had both interstate and intrastate authority. The state and federal agencies' separate review of the request resulted at times with the federal agency allowing discontinuance and the state agency refusing it. *See* H.R.Rep. No. 334, 97th Cong., 1st Sess. at 42 (1981). With the passage of Section 16 of the Bus Regulatory Reform Act of 1982 ("the Bus Act"), codified at 49 U.S.C. § 10935, Congress eliminated this dual regulatory system by giving the ICC the power to override a state's refusal to allow carriers to discontinue such routes.

Under the Bus Act, a carrier such as Greyhound must first submit a discontinuance application to the state regulatory commission. *See* 49 U.S.C. § 10935(a). If the state commission denies the application, the carrier may then petition the ICC for permission to discontinue the service. *Id.* Any person, including the state, may object to the carrier's ICC petition. 49 U.S.C.

the briefs and the appellate record, this three-judge panel has determined that oral argument would not materially assist the determination of

this appeal. *See* Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.

§ 10935(c). If such an objection is registered, the ICC will still grant the request for discontinuance:

> unless the Commission finds, *on the basis of evidence presented by the person objecting to the granting of such permission,* that such discontinuance ... is not consistent with the public interest or that continuing the transportation, without the proposed discontinuance ... will not constitute an unreasonable burden on interstate commerce.

49 U.S.C. § 10935(e)(1)(A) (emphasis added).[1] In deciding whether discontinuance is either not consistent with the public interest or not an unreasonable burden on interstate commerce, the ICC must "accord great weight to the extent to which interstate and intrastate revenues received for providing the transportation proposed to be discontinued ... are less than the variable costs of providing such transportation," 49 U.S.C. § 10935(g)(1), and the burden of proving the amount of revenues and costs is on the petitioner. *Id.* The ICC also must consider, "to the extent applicable," at least: (1) the National Transportation Policy; (2) whether the carrier has received an offer of financial assistance to provide the transportation to be discontinued; and (3) if it is the last service to the points involved, whether a reasonable alternative to the service is available. 49 U.S.C. § 10935(g)(2). The National Transportation Policy, codified at 49 U.S.C. § 10101, requires the ICC to promote competitive and efficient transportation services in order to: meet the needs of passengers and shippers; provide and maintain service to small communities, small shippers, and intrastate bus services; improve and maintain a sound, safe and competitive privately owned motor carrier system; allow the most productive use of equipment and energy resources; and enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions.

## II.

On November 1, 1988, Greyhound applied with the KCC to abandon the Kansas routes of Manhattan–Marysville,[2] Salina–Belleville,[3] and Arkansas City–Galena[4]. The KCC denied the application on March 1, 1989, after a full investigation that included four public hearings. The KCC determined that abandonment of bus service on these routes would be inconsistent with the public interest and that any financial benefit Greyhound may achieve by abandoning the routes was outweighed by the financial impairment which the communities along the routes would suffer.

On April 17, 1989, Greyhound petitioned the ICC under the Bus Act to review the KCC's denial of Greyhound's request to abandon the three routes. Within its petition, Greyhound stated that: ridership on the three routes was extremely low, with an average of 0.8 passengers per trip on the Manhattan–Marysville route, 1.8 per trip on the Salina–Belleville route, and 3.6 per trip on the Arkansas City–Galena route; variable costs exceeded revenues for each route, with deficits of $28,434, $17,325, and $31,875 respectively; and neither the state nor any other entity had offered Greyhound a subsidy for any of the routes.

In arriving at the above route deficits, Greyhound conducted several studies over a twelve-month period. The first study (covering each route) involved ticket sales for passengers in the form of trip envelopes. Through this study, Greyhound was able to determine the revenues for each trip, the length of the trip for each ticket, the origin and destination of each ticket, the average load for the trip, and

---

1. This standard applies to intrastate service for which, as in this case, the carrier received licensing authority on or before August 1, 1982. 49 U.S.C. 10935(e)(1)(B).

2. This route is between Manhattan and the Kansas–Nebraska state line.

3. This route is between the junction of U.S. Highways 24 and 81, north of Salina, and the Kansas–Nebraska state line, over U.S. Highway 81.

4. This route is between Arkansas City and the Kansas–Missouri state line.

the passengers' travel patterns. Greyhound then prepared Average Load Reports to determine the level of passenger ridership and the estimated revenue on a particular trip. In addition, Greyhound conducted studies to show the miles operated, revenue per passenger mile, average load, and revenue cents per mile. Greyhound also included all of the revenue from inbound or outbound package express shipments at each point to be discontinued.

Greyhound then compiled its variable costs of providing the round-trip service for each of the three routes. Except for agents' commissions (for which the actual expense was used), Greyhound determined its variable costs on these routes by multiplying its systemwide per mile variable cost by the number of miles traveled annually over these routes. These systemwide variable costs included depreciation for revenue equipment and labor and fuel costs.

The KCC filed a timely objection to Greyhound's ICC petition. In its objection, the KCC proposed, *inter alia*, that the ICC adjust Greyhound's financial data to include "off-route revenues"—that is, revenue earned by Greyhound on other routes but generated by passengers originating or terminating on the routes proposed to be discontinued. The KCC also presented evidence that: termination of bus service on these three routes would leave 12 communities without any bus service; the only alternative transportation available to the communities was to make use of family or friends or some other form of public transportation, such as a taxi, to drive patrons to the nearest town maintaining bus service; the cost to all community members of using this alternative ranged from $49,976 to $198,176; communities along the routes would suffer the economic loss resulting from the loss of sales commissions for ticket agents; and there were additional, nonfinancial costs of abandonment, such as the time cost for family and friends to drive patrons to other towns for bus service. As part of its evidence, the KCC submitted portions of the public testimony received at

its public hearings, at which 26 people testified against the discontinuance and about 10 of those 26 testified specifically about the inconvenience or prohibitive cost of using alternative transportation.

On June 30, 1989, the ICC granted Greyhound's request to discontinue the three routes because it determined that the KCC did not bear its burden of showing that discontinuance of the three routes was inconsistent with the public interest or was not an unreasonable burden on interstate commerce. Specifically, the ICC found that: the ridership on the routes was light; the routes were not self-sustaining and, unless discontinued, would have to be cross-subsidized by passengers on other, more successful routes; there was no offer of a subsidy; and, while a strong showing of public need for continued service coupled with evidence of an offer of a subsidy "might have served to mitigate the public interest impact of the unprofitability of the involved route," such mitigating factors did not appear here. *Greyhound Lines, Inc., Exit Petition—Kansas*, Interstate Commerce Commission Decision No. MC–1515 (Sub–No. 400) at 9 (June 30, 1989) ("ICC Decision"). The ICC noted the various goals of the National Transportation Policy at 49 U.S.C. § 10101, and concluded that the sum of those goals called for discontinuance of the service in question.

In making its decision, the ICC rejected KCC's proposal that it include off-route revenues in Greyhound's financial data. The ICC stated that it "has consistently accepted Greyhound's approach on this issue," (ICC Decision at 7), and noted that, under 49 CFR 1169.5(c), a petitioner such as Greyhound is required to exclude revenues which they expect to receive in connection with other services which they will still operate. The ICC then determined that:

> [W]e have discounted objectors' arguments that passenger revenue should include the entire amount earned from ticket sales on a subject route, and arguments that if a service point is eliminated, so is all revenue attributable to passengers boarding or alighting at that

point. The apportioning of revenue to miles traveled on the subject route is proper.

*Id.*[5]

On July 12, 1989, the KCC filed a petition to stay the ICC June 30 order, which the ICC denied. In that denial, the ICC stated that "general, imprecise testimony of need [given at the KCC public hearings] was undercut by the minimal testimony from actual users of the service and the undeniably low patronage along the route," and was insufficient to require a stay. *Greyhound Lines, Inc., Exit Petition—Kansas,* Interstate Commerce Commission Decision No. MC–1515 (Sub–No. 400) at 2 (July 13, 1989) ("ICC Decision Denying Request for Stay").

The KCC then filed a petition for reconsideration, in which the KCC reiterated both that the ICC should include Greyhound's off-route revenues in calculating Greyhound's financial data and that, in any case, discontinuance of the routes was not in the public interest because of the lack of reasonable alternative transportation. In its denial of this latter petition on November 8, 1989, the ICC found that: the Commission has never accepted the approach of including off-route revenues associated with involved services and will not do so now; the Commission did not give great weight to the KCC's hypothetical data concerning the costs of available alternative transportation; 49 U.S.C. § 10935 does not require the ICC to consider the *costs* of available transportation, merely its *availability;* in any event, the KCC's data was flawed because it did not take into consideration the costs that bus passengers would incur in travelling to the bus station even if service were continued; considering the substantial mileage between the discontinued stops, it is likely that many passengers would still have incurred such costs; and because of the extremely low ridership

levels on the involved routes, the assertedly high cost of alternative transportation will affect relatively few individuals.

The KCC then filed the instant petition for judicial review.[6] In this petition, the KCC claims that: 1) the ICC's determination that continued bus service would constitute an unreasonable burden on interstate commerce was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence; and 2) the ICC misapplied the statutory standard of the Bus Act when it found that discontinuance of the three routes in question was not inconsistent with the public interest.

### III.

"It is well known that the ICC's authority in these matters is broad, and our scope of review narrow." *C.O.D.E., Inc. v. ICC,* 768 F.2d 1210, 1212 (10th Cir.1985). We may not set aside an action by the ICC unless it is arbitrary, capricious, and an abuse of discretion, or unless it is unsupported by substantial evidence on the record as a whole or not in accordance with the law. *American Trucking Assocs., Inc. v. ICC,* 703 F.2d 459, 462 (10th Cir.1983).

### A.

■ The KCC claims that the ICC's determination that continued bus service would constitute an unreasonable burden on interstate commerce was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence. In support of its claim, the KCC argues that the ICC erred when it allowed Greyhound to exclude all off-route revenues. The KCC argues that: under the Bus Act, it is the petitioner's burden to prove revenues and costs; in this case, the petitioner (Greyhound) developed no data to determine how much off-route revenue it would retain if the three routes in question were discontin-

---

**5.** The ICC did accept other financial adjustments proposed by the KCC. However, the ICC determined that, even with these adjustments, Greyhound was still functioning at approximately the same deficits that Greyhound had originally calculated.

**6.** In No. 89–9543, *The State Corp. Comm. of Kansas v. Interstate Commerce Comm.,* the KCC filed a petition for review of the ICC's June, 1989 decision in this case. That petition was voluntarily dismissed, and the instant petition was filed after the ICC issued its November 1989 decision.

ued; instead, Greyhound made the "assumption that it would maintain 100 percent of the overhead revenues from the routes" (Brief of Petitioner at 20); such an assumption is "wholly and completely unsupported by any evidence whatsoever" (*Id.* at 21); indeed, the KCC presented evidence to the contrary in the form of public hearing testimony; thus, the ICC's decision to accept this assumption is arbitrary, capricious and unsupported by evidence in the record.

In response, the ICC asserts that 49 CFR 1169.5(c) requires Greyhound to exclude revenues that it expects to receive and that off-route revenues are typically excluded in bus discontinuance cases under this regulation.

"The ICC's interpretations of its regulations and the facts supporting a grant or denial of a certificate require recognition of its expertise and our deference thereto." *Midwestern Transp., Inc. v. ICC,* 635 F.2d 771, 774 (10th Cir.1980) (citations omitted). We note, as did the court in *Pennsylvania Public Utility Comm'n v. United States,* 749 F.2d 841, 848 (D.C.Cir.1984), "[t]he Commission ... did not accept the challenged data uncritically or without an appreciation of the carrier's underlying methodology." Here, as in that case, Greyhound "had exhaustively explained its methodology and ... the ICC had considered in detail and approved this methodology in prior discontinuance decisions." *Id.* Given these circumstances, we must hold that the ICC's decision to allow Greyhound to exclude off-route revenues in its calculations was not arbitrary, capricious, an abuse of discretion or unsupported by the evidence as a whole.

■ Also in support of its claim, the KCC argues that the ICC erroneously accepted Greyhound's systemwide variable cost data rather than requiring Greyhound to develop route-specific costs, and that the ICC erroneously failed to require Greyhound to supply the underlying data supporting its conclusions regarding systemwide variable costs. Apparently the KCC makes these claims for the first time on appeal, and we ordinarily do not entertain

such claims. *Anschutz Land & Livestock Co. v. Union Pac. R.R. Co.,* 820 F.2d 338, 344 n. 5 (10th Cir.), *cert. denied,* 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987).

Even if the KCC had properly preserved these claims, we would hold them to be meritless. We note that the ICC is familiar with Greyhound's data compiling methodologies due to prior Greyhound discontinuance proceedings. ICC Decision at 6. We also note that the KCC does not dispute that its staff visited Greyhound's accounting office in Des Moines, Iowa, audited Greyhound's supporting record, and did not object to this portion of the record as inaccurate. As such, we hold that the ICC's findings on these issues are not arbitrary, capricious, or unsubstantiated by the record.

### B.

■ The KCC claims that the ICC misapplied the statutory standard of the Bus Act when it found that discontinuance of the three routes in question was not inconsistent with the public interest. Specifically, the KCC argues that: the legislative intent of the Bus Act clearly requires the ICC to make a full consideration of the impact abandonment of bus service will have on the public interest; while Congress did not define the phrase "public interest," it is clear that Congress rejected the notion that the "public interest" be limited to the profitability of the motor carriers; 49 U.S.C. § 10935(g)(2) requires that the ICC consider whether a "reasonable alternative" to the bus service is available; "reasonable alternative" must mean alternatives that are economically feasible; the KCC presented unrefuted evidence that other carriers would not offer a viable alternative; thus, the ICC erroneously found that services by Greyhound "and other carriers" will continue to offer useable alternative service (ICC Decision at 9); the public interest standard cannot be met by the ICC's speculative belief that other services on nearby routes should be useable alternatives; and the ICC erred when it stated that the Bus Act does not require it to consider the "*costs* of alternative transpor-

tation, merely its *availability*" (*Greyhound Lines, Inc., Exit Petition—Kansas,* Interstate Commerce Commission No. MC–1515 (Sub–No. 400) at 3 (Nov. 8, 1989) ("ICC Rehearing Decision") (emphasis in original)).[7]

Generally when, as here, variable costs exceed revenues, there is "a virtual presumption in favor of discontinuance." *Pennsylvania Public Utility Comm'n, supra,* 749 F.2d at 847. We agree that the ICC should consider cost when determining whether "reasonable alternative" transportation is available. However, the ICC did make such considerations here when it determined that, even if it were to consider costs, the KCC had not met its burden of showing that discontinuance was not in the public interest. ICC Rehearing Decision at 3.

We hold that the ICC's findings in this regard are not arbitrary, capricious or an abuse of discretion. In so holding, we note the ICC's observation that, under the Bus Act, "the question is not simply whether losses of services will result, for then the provisions of the Bus Act would be a nullity.... [W]e must consider not only the local interest in support of continuing the involved service but also the policy of the Bus Act that favors exit from unprofitable routes." ICC Decision at 9.

The petition for review is denied.

---

**7.** The KCC also objects to the ICC's statement that the KCC's data is flawed because it "apparently [did] not take into consideration the costs that bus passengers would incur *even if* service were not discontinued." ICC Rehearing Decision at 3 (emphasis in original). The KCC interprets this statement to mean that the ICC anticipates the customers to incur no cost once bus service is abandoned. We, on the other hand, interpret this statement to mean only that at least some passengers were already paying some cost to *get* to the bus service because the points to be discontinued were very far apart. Given the facts of this case, we hold that this finding is not arbitrary, capricious or unsupported by the evidence.