747 F.2d 179
 Doris AUVILLE, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
and
Virginia Stage Lines, Inc., Intervenor.
PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, an agency of the
State of West Virginia, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Virginia Stage Lines, Inc., Intervenor.
 Nos. 84-1362(L), 84-1363.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 11, 1984.
Decided Sept. 17, 1984.
 
 Robert R. Rodecker, Charleston, W.Va. (Franklin G. Crabtree, S. Thornton Cooper, Norman Googel, Charleston, W.Va., on brief), for petitioners.
 Evelyn G. Kitay, I.C.C. (John Broadley, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, J. Paul McGrath, Asst. Atty. Gen., Robert B. Nicholson, George Edelstein, Dept. of Justice, Washington, D.C., on brief) and Carl Fletcher, for respondents.
 Before WINTER, Chief Judge, and CHAPMAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 At the instance of Doris Auville and the Public Service Commission of West Virginia (PSCWV), we review an order of the Interstate Commerce Commission (ICC), entered March 1, 1984, authorizing Virginia Stage Lines, Inc. (VSL) to discontinue its bus service between Huntington and Welch, West Virginia, and between Logan and Charleston, West Virginia, notwithstanding the denial of such permission by PSCWV. The order of the ICC was entered pursuant to the authority vested in it by the Bus Regulatory Reform Act of 1982 (the Act), 49 U.S.C. Sec. 10935. The order under review was entered after reconsideration of an earlier order, entered September 9, 1983, which denied VSL authority to discontinue these operations.
 
 
 2
 Petitioners assert that the March 1, 1984 order should be set aside because the ICC lacked authority to reconsider its prior order, because the March 1, 1984 decision is not supported by substantial evidence, and because the decision is arbitrary and capricious. As part of the latter contention, petitioners argue that the ICC erred as a matter of law in ruling that they had not met their burden of showing that the discontinuance of bus service would be inconsistent with the public interest.
 
 
 3
 We see no merit in any of these contentions and so we affirm the order under review.
 
 I.
 
 4
 In January, 1983, VSL initiated a proceeding before PSCWV for authority to abandon intrastate bus service between Logan and Charleston and between Huntington and Welch. When this permission was denied in May, 1983, VSL filed its petition with the ICC under the Act for permission to discontinue its interstate and intrastate service between these points.
 
 
 5
 Since the adoption of the Act in 1982, the ICC has had authority to grant the requested permission. Of course, prior to 1982, the ICC could authorize the discontinuance only of interstate service, but the Act modified the exclusive jurisdiction of a state regulatory commission to authorize the discontinuance of intrastate bus service. It authorizes the ICC to grant such permission whenever a state commission denies authority therefor or delays deciding a request therefor beyond 120 days. 49 U.S.C. Sec. 10935(a). If an application to discontinue intrastate service in whole or in part is made and there is no objection by a consumer or a state governmental unit, the ICC must grant the request. If there is objection, the ICC must still grant the request:
 
 
 6
 unless the Commission finds, on the basis of evidence presented by the person objecting to the granting of such permission, that such discontinuance ... is not consistent with the public interest or that continuing the transportation ... will not constitute an unreasonable burden on interstate commerce.
 
 
 7
 Sec. 10935(e)(1)(A) (emphasis added).
 
 
 8
 Congress has specified certain factors for the ICC to consider in deciding whether to allow intrastate service to end:
 
 
 9
 In making a finding under subsection (e)(1) of this section, the Commission shall accord great weight to the extent to which interstate and intrastate revenues received for providing the transportation proposed to be discontinued ... are less than the variable costs of providing such transportation, including depreciation for revenue equipment.
 
 
 10
 49 U.S.C. Sec. 10935(g)(1) (emphasis added).
 
 
 11
 The statute places the burden of providing revenue and cost data on the carrier, id. Congress also directed the ICC to consider "to the extent applicable":
 
 
 12
 (A) the national transportation policy of section 10101 of this title;
 
 
 13
 (B) whether the ... carrier ... has received an offer of, or is receiving, financial assistance to provide the transportation ... from a financially responsible person (including a governmental authority); and
 
 
 14
 (C) ... whether the transportation is the last motor carrier of passenger service to [a] point and whether a reasonable alternative to such service is available.
 
 
 15
 49 U.S.C. Sec. 10935(g)(2).
 
 
 16
 In its application to the ICC, VSL asserted that the routes it sought to abandon had been unprofitable for at least six years and that it had twice sought to transfer them to another carrier having lower operating costs, only to be thwarted by the express denial of permission of inaction by PSCWV. It submitted financial data purporting to show that its variable costs exceeded its relevant revenues. It alleged that it receives no operating subsidy for any of its operations, and that it would be necessary to double rates, with the resulting effect of discouraging ridership, to approach profitability. Allegations as to other available service were made.
 
 
 17
 Petitioners filed objections to the petition, and the ICC undertook to decide the case on the papers.[1] By opinion and order filed September 13, 1983, the ICC denied the application, two days before the ninety-day statutory period for final action by ICC had expired. In its opinion, the ICC stated that the Act required denial when the carrier failed to establish that its variable costs exceeded its revenues for the routes at issue. Reasoning that VSL's revenue and cost figures were unreliable and thus not competent to establish that the routes at issue were unprofitable, the ICC concluded, without further explanation, that discontinuance was inconsistent with the public interest and that continuance would not constitute an unreasonable burden on interstate commerce.
 
 
 18
 On October 3, 1983, VSL filed a discretionary appeal, termed a petition to reopen, claiming that the ICC's September 13, 1983 decision contained material errors of fact and of law. Although petitioners objected to a reopening of the proceedings, principally on jurisdictional grounds, the ICC concluded that it had jurisdiction and proceeded to consider VSL's new analysis of the financial evidence originally submitted as well as the other evidence of record.
 
 
 19
 A second opinion and order were filed on March 1, 1984, and this time the ICC granted VSL's petition to discontinue the service at issue. Noting at the outset that its first opinion had failed to address all the statutory factors, the ICC determined that it had erred in previously treating as determinative VSL's failure to establish unprofitability. It also concluded, after reviewing the financial evidence in light of VSL's new analysis, that VSL had, indeed, established that its variable costs exceeded its revenues for the runs at issue. Giving this factor great weight and examining the other statutory factors (the national transportation policy, the lack of an offer to subsidize, the fact that VSL's was the only motor carrier service to the affected areas, and the alternatives to VSL's service), the ICC concluded that continuance would be an unreasonable burden on interstate commerce and was not required by the public interest. The ICC assumed that the unprofitability of the runs at issue was relevant to the question of the public interest as well as the question of the burden on interstate commerce. The petition for us to review followed.
 
 II.
 
 20
 We consider first petitioners' jurisdictional challenge. It is founded upon the provision of 49 U.S.C. Sec. 10935(e)(4) that requires the ICC to "take final action upon [a petition filed under Sec. 10935] not later than 90 days after the date the carrier files such petition." Petitioners argue that, since VSL did not even request reopening of its case until more than ninety days had elapsed since the date it filed its first petition, the ICC lacked authority to act upon the request for reopening. We reject the argument.
 
 
 21
 First, Sec. 10935 does not explicitly preclude reconsideration of a decision after ninety days from the date of institution of the case. Second, the ICC is authorized by 49 U.S.C. Sec. 10322(g)(1) to reopen, on its own motion or on the petition of an interested party, a proceeding "because of material error, new evidence or substantially changed circumstances." While the deadlines fixed in other provisions of Sec. 10322 are made inapplicable to proceedings under Sec. 10935, see Sec. 10322(a), there is no deadline prescribed for reopening and hence the reasonable construction of the two sections is that the ICC has statutory authority to reopen under the prescribed conditions even though more than ninety days from the original petition have elapsed. Certainly this is the interpretation placed on Sec. 10322 by the ICC regulations, see 49 C.F.R. Sec. 1169.11(a), as well as by the decision of the ICC in this case. It is axiomatic that the interpretation of the statute by the agency charged with administering it is entitled to considerable deference. See Batterton v. Francis, 432 U.S. 416, 426-27, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977). Finally, in an analogous case, the District of Columbia Circuit has held that another section of the Interstate Commerce Act requiring final ICC action by a given date did not bar petitions for administrative reconsideration after that period had elapsed. See Pennsylvania v. ICC, 590 F.2d 1187, 1193-94 (D.C.Cir.1978).
 
 III.
 
 22
 Petitioners' contention that the order is arbitrary and capricious rests upon three subsidiary arguments. First, petitioners assert that the action of the ICC unlawfully extended the statutory period within which a final decision was to be made. We have decided that contention is lacking in merit.
 
 
 23
 Next, petitioners argue that the ICC failed to articulate the "extraordinary circumstances" justifying reconsidering the September 13, 1983 decision. See 49 C.F.R. Sec. 1169.11. This argument, too, lacks merit. In its March 1, 1984 decision, the ICC said explicitly and demonstrated clearly that it thought that it had made legal and factual errors in its prior opinion as well as its ultimate decision. We think that the ICC's determination that material error is an "extraordinary circumstance" is not only entitled to great weight to which we should defer, but that it is reasonable and consistent with the Act, Sec. 10322, and the ICC's regulations, 49 C.F.R. Sec. 1115.3(b)(3).
 
 
 24
 Finally, petitioners argue that the ICC improperly departed from prior law, i.e., its September 9, 1983 decision, when it reached different conclusions in its March 1, 1984 decision without taking new evidence or explaining the reasons for the departure. We think the obvious answer to this is that the ICC was not required to take additional evidence and that it could alter its decision where, as it said here, it concluded that its prior decision was incorrect in law and in fact.
 
 
 25
 We conclude that the March 1, 1984 order was not arbitrary or capricious.
 
 IV.
 
 26
 We consider next petitioners' contention that the March 1, 1984 order is not supported by substantial evidence. Petitioners attack the ICC's findings with respect to the shortfall between VSL's revenues from the operations in issue and the variable costs attributable thereto.
 
 
 27
 In its March 1, 1984 opinion, the ICC remarked that VSL's "presentation of its revenue/variable cost evidence in this case can only be described as confused and confusing." The confusion was compounded by the fact that VSL maintained no separate financial data for the Huntington-Welch service so that it was necessary for VSL to adjust the financial data for the Huntington-Roanoke service (of which Huntington-Welch was a part) to approximate the figures attributable to Huntington-Welch. The ICC was willing to accept VSL's analysis, finding that any error in the analysis would have inflated Huntington-Welch revenues because, on the total run, VSL presented "clear evidence" that passenger loads were distinctly higher on the Roanoke-Welch segment than on the Welch-Huntington segment. Overall, the ICC found a shortfall of revenues below variable costs on the Roanoke-Huntington operations of approximately $83,000 and on the Logan-Charleston operations of approximately $13,000.
 
 
 28
 Petitioners' principal attack is on the figure to be included for bus drivers' wages in variable costs. In the March 1, 1984 order, the ICC apparently used the figure of $.50 per mile although the evidence showed (indeed as found by the ICC in its September 13, 1983 opinion) the correct figure is $.359 per mile. While the difference is substantial, the difficulty with petitioners' argument is that, even if the adjustment downward is made, the extent of the shortfall between revenues and variable costs is merely reduced, not eliminated.
 
 
 29
 Petitioners also contend that other adjustments must be made which, singly or collectively, would demonstrate that revenues exceed variable costs. They argue that revenues should be increased upwards to reflect rate increases granted by PSCWV on May 31, 1983. There is no reason, however, to think that the ICC failed to give consideration to these rate increases. Its September 13, 1983 opinion recites that VSL provided data with regard to them. Certainly petitioners offered no specific evidence or financial analysis to show that VSL's revenues would exceed those claimed by VSL or found by the ICC.[2]
 
 
 30
 Petitioners also argue that VSL improperly included certain administrative costs in variable costs, that VSL may have improperly included depreciation on non-revenue equipment in variable costs and also may have improperly included station expenses, insurance and safety expenses, operating taxes and licenses in variable costs. We deem these contentions too speculative to warrant disturbing the ICC's order. Actual proof is lacking, and in summary, we are persuaded that, while exact figures are not available, there is substantial evidence to support the ICC's finding "that revenues are well below variable costs," and that the VSL figures "are sufficiently precise for [ICC] purposes because of the substantial gap between revenues and variable costs."
 
 V.
 
 31
 Finally, we are not persuaded by petitioners' argument that the ICC's decision to permit discontinuance of service was in violation of Congressional intent as to the proper standard by which to judge the public interest. Instead, we conclude that the ICC relied on the proper standard and correctly determined that petitioners' evidence was insufficient to show that the public interest required continuation of the service.
 
 
 32
 In essence, petitioners argue that the public interest test is separate and distinct from the test of unprofitability. It is true that Sec. 10935(e)(1)(A) requires the ICC to deny VSL's request if the ICC finds on the basis of evidence presented by petitioners that "such discontinuance ... is not consistent with the public interest or that continuing the transportation ... will not constitute an unreasonable burden on interstate commerce." At the same time, however, Sec. 10935(g)(1) says that "[i]n making a finding under subsection (e)(1) of this section, the Commission shall accord great weight to the extent to which interstate and intrastate revenues received for providing the transportation proposed to be discontinued ... are less than the variable costs of providing such transportation, including depreciation for revenue equipment." While Sec. 10935(e)(1)(A) appears to speak in the disjunctive, Sec. 10935(g)(1) makes financial loss a factor in each of the two Sec. 10935(e)(1)(A) standards. Certainly this is the interpretation which the ICC has placed on the Act, and under settled law, we should defer to it. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); United States v. American Trucking Ass'n, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940).
 
 
 33
 When, as we conclude, the financial impact of continuing service is properly considered in determining the public interest, we think that there is substantial evidence to support the finding of the ICC that the public interest required granting VSL the requested authority to discontinue service and that petitioners did not present evidence compelling a contrary conclusion. We note that the ICC also gave due consideration to the other relevant factors specified in Sec. 10935(g)(2).
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 As a practical matter, the Act mandates this procedure because it requires the ICC to take final action on a petition under Sec. 10935 "not later than 90 days after the carrier files such petition." See Sec. 10935(e)(4)
 
 
 [2]
 We reject the calculation in petitioners' brief which would increase total revenues by the percentage of rate increase which was granted. Even petitioners concede that this would not reduce the shortfall by more than 50 percent, but more significantly, the method of calculation fails to consider that increasing rates would tend to reduce ridership