The STATE OF TEXAS, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

No. 84–4086.

United States Court of Appeals, Fifth Circuit.

April 4, 1985.

Jim Mattox, Atty. Gen., Stephen J. Davis, Asst. Atty. Gen., Austin, Tex., for petitioner.

William French Smith, Atty. Gen., U.S. Dept. of Justice, John J. Powers, III, George Edelstein, John Broadley, Gen. Counsel, I.C.C., J. Carol Brooks, Washington, D.C., for respondents.

E. Barrett Prettyman, Jr., Washington, D.C., for intervenor Greyhound Lines, Inc.

Before RUBIN, TATE, and HILL, Circuit Judges.

TATE, Circuit Judge:

The State of Texas ("Texas") seeks review of an order issued by the Interstate Commerce Commission ("the Commission") pursuant to Section 16 of the Bus Regulatory Reform Act of 1982, 49 U.S.C. § 10935 ("the Bus Act"), granting Greyhound Lines, Inc. ("Greyhound") permission to discontinue bus service over certain routes within the state. Texas petitions this court for review of the Commission's order, and Greyhound intervenes in support of the Commission. We affirm.

Following enactment of the Bus Act, Greyhound applied to the Railroad Commission of Texas to discontinue intrastate bus service on its interstate route between Houston and San Antonio and at forty-six off-route points on nine other interstate routes. Upon the state agency's denial of its application, Greyhound then petitioned the federal Interstate Commerce Commission to discontinue such routes, as authorized by Section 16 of the Bus Act, 49 U.S.C. § 10935. The Interstate Commerce Commission in late 1983 issued an order granting Greyhound's request with regard to the Houston-San Antonio route and to 26 (of the 46) off-route points. Texas' petition for review of this order is now before us.

*Overview*

As will be described more fully below in I *infra*, the 1982 Bus Act empowered the Commission to authorize discontinuance of intrastate service, despite the refusal of the state regulatory agency to permit cessation of such service. However, a more strin-

gent standard was provided with regard to discontinuance of service over routes authorized prior to August 1, 1982 (the year of passage of the Act), than over those that were to be authorized subsequent to that date. *See* II *infra.* The more stringent standard reflected Congress' concern "to ensure that regulatory reform of the bus industry would protect the public interest in continued service to rural America." *Pennsylvania Public Utility Commission v. United States,* 749 F.2d 841, 844 (D.C. Cir.1984).

The principal issue for our review is raised by Texas' contention that— by permitting Greyhound to discontinue service to numerous intrastate points despite Greyhound's failure to prove it sustained an operating loss in providing such service— the Commission misconstrued the statute so as to eliminate the Congressionally intended protection to smaller communities against discontinuance of business service. The construction of the Bus Act for which Texas contends was substantially adopted by the District of Columbia Circuit, reversing the Commission, as in accord "with the clear congressional intent behind the Bus Act." *Pennsylvania Public Utility Commission, supra,* 749 F.2d at 847.[1]

However, two other circuits have decided to the contrary, when faced with the issue of statutory construction now before us, and have upheld the construction of the statute now relied upon by the Commission. *Auville v. Interstate Commerce Commission,* 747 F.2d 179, 184–85 (4th Cir.1984); *Humphrey v. United States,* 745 F.2d 1166, 1168–69 (8th Cir.1984). In *Auville,* the court did so specifically in deference under applicable principles to the Commission's interpretation of the statute entrusted to its administration. 747 F.2d at 184.

Ultimately, we affirm the Commission's interpretation of the statute as "a permissible construction of the statute" thus requiring our deference to the Commission's

interpretation thereof, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* —— U.S. ——, ——, 104 S.Ct. 2778, 2782 & n. 11, 81 L.Ed.2d 694 (1984); *Western Coal Traffic League v. United States,* 719 F.2d 772, 773, 777 (5th Cir.1983) (en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984), even though— absent such requisite deference to the Commission's construction—this panel may well have decided that the construction accorded to the statutory provisions by the District of Columbia Court of Appeal is more in accord with their legislative intent.

### I. *Section 16 of the Bus Act, 49 U.S.C. § 10935*

Before 1982, state regulatory commissions had exclusive jurisdiction to grant or deny requests to discontinue intrastate bus services. Congress found that these commissions often "created impediments that prevented [interstate carriers] from abandoning unproductive routes." *Humphrey v. United States,* 745 F.2d 1166, 1168 (8th Cir.1984). To overcome this problem (but with greater safeguards against discontinuance of authorized pre-1982 service), Congress enacted Section 16 of the Bus Regulatory Reform Act of 1982, Pub.L. 97–261, § 16(a), 96 Stat. 1115. *See* 49 U.S.C. § 10101(a)(3)(c); S.Rep. No. 411, 97th Cong., 2d Sess. 7–10, 25, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2314–17, 2332 ("Senate Report"); H.R.Rep. No. 334, 97th Cong., 1st Sess. 24–25 (1981) ("House Report"); 128 Cong.Rec.H. 6692 (daily ed. Aug. 19, 1982) (statement of Rep. Anderson); *Id.* at H. 6693–94 (statement of Rep. Clausen). This Section of the Bus Act, which is now codified at 49 U.S.C. § 10935, sought to remedy the problem by giving the Interstate Commerce Commission final authority over requests to discontinue intrastate bus service.

Under § 10935, an interstate carrier, such as Greyhound, must follow a two-step process to obtain permission to discontinue

---

1. Indeed, in an earlier decision the Commission itself had adopted such construction. The Commission's change of position is the basis for Texas' further contention on this review that it

was denied due process by the Commission's change of interpretation while the present proceedings were pending before it. *See* IV *infra,* in the text.

intrastate bus service on a route over which the carrier has intrastate and interstate authority. The first step is to submit an application to the state regulatory commission with jurisdiction to grant the discontinuance. If the state commission denies the request or fails to act on it within a specified period, step two comes into play: the carrier may petition the Interstate Commerce Commission for permission to discontinue the service. 49 U.S.C. §§ 10935(a), 10935(e)(3). If no timely objection to the petition is filed,[2] the Commission must approve it. § 10935(d).

However, if timely objection *is* filed, the Commission "shall" grant it *"unless"* the objector makes certain showings, which differ as to whether discontinuance is sought as to a route required to be served by the carrier was authorized *before* August 1, 1982 (as were the present routes), § 10935(e)(1), or *after* that date, § 10935(e)(2). The statute also requires certain considerations to be given when the application is to discontinue a 1982 route under (e)(1) only, 49 U.S.C. § 10935(g)(1), as well as certain other considerations to be given when discontinuance of the route is sought *either* under (e)(1) (pre-1982 routes) or (e)(2) (routes authorized after 1982), 49 U.S.C. § 10935(g)(2). The statutory ambiguity resulting from the interplay between these differing standards and requirements (*see* II *infra*) is the basis of the conflicting interpretations of § 10935(e) now before us, with regard to the showing required

before pre-1982 intrastate bus service may be discontinued.

## II. *Discontinuance: pre-1982 versus post-1982*

When discontinuance is sought over objection, § 10935(e)(1) & (2) provide for the grant or denial of the application unless the objector makes certain showings, depending upon whether the route upon which discontinuance is sought was authorized before or after August 1, 1982:

*a.* As to routes authorized *before* the 1982 date, the Commission "shall" grant the application *"unless"* the objector shows that the discontinuance "is not consistent with the public service *or* that continuing the transportation will not constitute an unreasonable burden on interstate commerce.[3] § 10935(e)(1)(A) (emphasis added). Thus, discontinuance will be denied if the objector proves that *either* the "public interest" *or* the "burden on interstate commerce" test is not met.

*b.* As to routes authorized *after* the 1982 date, the Commission "shall" grant the application for discontinuance *"unless"* the objector proves that continuing the transportation "will not constitute an unreasonable burden on interstate commerce," with continuance being an unreasonable burden unless the objector proves that discontinuance "is not consistent with the public interest *and* that ... revenues from such service ... are not less than the variable costs of providing the transportation proposed to be discontinued."[4]

---

**2.** Section 10935(c) provides that "[a]ny person (including a department, agency, or instrumentality of a State or local government) may object to the Commission to the granting of permission to any [interstate] carrier to discontinue or reduce transportation under this section." Objections must be filed within twenty days after the petition is filed. § 10935(d).

**3.** 49 U.S.C. § 10935(e)(1)(A) provides:

... the Commission shall grant such permission [to discontinue a *pre*-1982 route] unless the Commission finds, on the basis of evidence presented by the person objecting to the granting of such permission, that such discontinuance or reduction is not consistent with the public interest or that continuing the transportation, without the proposed discon-

tinuance or reduction will not constitute an unreasonable burden on interstate commerce.

**4.** 49 U.S.C. § 10935(e)(2)(A) provides:

... the Commission shall grant such permission unless the Commission finds, on the basis of evidence presented by the person objecting to the granting of such permission, that continuing the transportation, without the proposed discontinuance or reduction, will not constitute an unreasonable burden on interstate commerce. For the purposes of this paragraph, continuance of the transportation would not constitute an unreasonable burden on interstate commerce only if discontinuance or reduction of such transportation is not consistent with the public interest and the interstate and intrastate revenues from such

§ 10935(e)(2)(A) (emphasis added). Thus, to defeat continuance as to post-1982 routes, the objector must prove *both* that discontinuance is inconsistent with the public interest *and* also that the variable costs do not exceed the revenues.

The statute further provides that, with regard (*only*) to applications to discontinue pre-1982 service under (e)(1), the Commission "shall give great weight" to the extent to which revenues exceed "variable costs" of providing the service, with the carrier having the burden to prove "the amount" of its revenues received for providing the service and also "the variable costs" of providing it.[5] § 10935(g)(1). Congress did not define the term "variable costs" in the statute, and the Commerce Commission chose not to define the term in its regulations. *See* 47 Fed.Reg. 42928–42929 (1982). Although the components of variable costs were not defined, in the context of the Commission's discussion in the present case they seem to be the day-to-day operating costs of providing the service, as contrasted with the "full economic costs" (overhead, etc.) involved.

In the present instance, the Commission found that Greyhound did not meet its burden of proving that its variable costs exceeded the revenues for the routes to be discontinued. At the same time, for reasons to be summarized later, it found that Texas did not meet *its* burden of proving that discontinuance was not justified under either the "public interest" test or the "burden on interstate commerce test."

Texas argues that, contrary to the demonstrated congressional intent, the Commission has in effect used the same test—the economic burden on interstate commerce—to grant a discontinuance to intrastate service authorized pre-1982 as would be used to grant the discontinuance to service authorized post-1982. Texas persuasively argues that, under the statutory provisions in question, the "public interest" test for continued service[6] is distinct from the "burden on interstate commerce test,"[7] with the latter being statutorily denoted as an economic test only, essentially being met only where the variable costs exceed the revenues of the services sought to be discontinued.[8]

service under reasonable pricing practices are not less than the variable costs of providing the transportation proposed to be discontinued or reduced.

5. 49 U.S.C. § 10935(g)(1) provides:

In making a finding under subsection (e)(1) of this section, the Commission shall accord great weight to the extent to which interstate and intrastate revenues received for providing the transportation proposed to be discontinued or reduced are less than the variable costs of providing such transportation, including depreciation for revenue equipment. For purposes of the preceding sentence, the carrier filing a petition for permission to discontinue or reduce service shall have the burden of proving the amount of the interstate and intrastate revenues received for providing the transportation and the variable costs of providing the transportation.

6. In its unpublished opinion of December 12, 1983, *Petition of Greyhound Lines, Inc.,* No. MC–1515 (Sub-No. 343), the Commission equated "public interest" as including "the needs of passengers and shippers," and "to provide for and maintain intrastate bus services to small communities and small shippers," although it also stated that "[w]hether the public interest sup-

ports continuation ... includes an analysis of the national transportation policy, whether a subsidy has been offered, and whether reasonable alternative service is available." P. 10 of opinion. It also included, however, economic costs in its public interest analysis. *See, e.g.,* p. 12.

7. The Commission's opinion, cited note 6 *supra,* mainly cited as an unreasonable burden on interstate commerce Greyhound's evidence of unprofitability (although the revenues did not establish they were below variable costs, the Commission stated they were "clearly below full cost," involving cross-subsidization by interstate revenues of these intrastate costs), p. 12, and it also cited Greyhound's argument of a burden on interstate commerce as arising not only from these economic costs but also from the circumstance that elimination of these allegedly unnecessary intrastate stops "would provide the majority of its passengers with improved and better services," p. 12.

8. Texas then concludes that, since the Commission found that Greyhound did not prove that variable costs/interstate-commerce-burden exceeded revenues, the Commission erred as a matter of law in granting Greyhound's application to discontinue the service in question.

We agree with Texas that the statute is at least ambiguous in the respects noted. With regard to discontinuance of pre-1982 service, the disjunctive "or" test provided by (e)(1), and the apparent dichotomy of "public interest" and variable-costs "interstate-commerce-burden" expressed by (e)(2), the "public interest" in continuance of the service might reasonably be construed as based on non-economic factors, and the "burden on interstate commerce" as on economic factors (unprofitability), with the opponent to discontinuance of pre-1982 service required to prove only the public's interest in continued service (and with the carrier, under (g)(1), bearing the burden of proving that its variable costs exceeded its attributable revenues before an unreasonable burden on interstate commerce resulted). Indeed, in *Pennsylvania Public Utility Commission, supra,* the District of Columbia's analysis of the statute, reinforced by its extensive examination of the legislative history, 749 F.2d at 850–53, reached a conclusion much similar to the construction advanced by Texas that "public interest" and "burden on interstate commerce" concerns were distinct requirements and that the Commission was not authorized by the statute, as it did in the present case also, to balance the public interest and the financial burden concerns against one another.

Unlike the District of Columbia Circuit, however, we cannot find clear congressional intent for such construction, either from the words of the statute itself (or, for that matter, from its legislative history). Required as we are to defer to the Commission in its resolution of statutory ambiguities, we are unable to find that the Commission's interpretation is contrary to the clear intent of Congress (although, absent such deference, a majority of the panel might well resolve the ambiguity otherwise than did the Commission).

With regard to the statute, (g)(1) (quoted in note 5 *supra*) provides, with specific reference to discontinuance (only) of pre-1982 service, that "[i]n making *a* finding" (emphasis added) the Commission "shall accord *great weight*" (only) to the variable-costs factor in making a finding under (e)(1)—which finding would include application of both tests ("public interest" and "interstate burden"). The statute does not, as Texas seems to argue, require that conclusive weight be given to this factor under either test. Furthermore, of importance, the statute in (g)(2) provides that "[i]n making *a* finding" under *either* (e)(1) (pre-1982 service) *or* (e)(2) (service authorized post-1982), the Commission shall consider the national transportation policy, the offer or receipt of a subsidy, and the availability of reasonable alternative services.[9] Thus, on its face, the ambiguous statute is, in our opinion, reasonably susceptible of the construction afforded it by the Commission: that, in making a (single) finding that an

---

**9.** 49 U.S.C. § 10935(g)(2) provides:

In making a finding under subsection (e)(1) or (e)(2) of this section, the Commission shall consider, to the extent applicable, at least—

(A) the national transportation policy of section 10101 of this title;

(B) whether the motor common carrier of passengers has received an offer of, or is receiving, financial assistance to provide the transportation to be discontinued or reduced from a financially responsible person (including a governmental authority); and

(C) in the case of a petition to discontinue transportation to any point, whether the transportation is the last motor carrier of passenger service to such point and whether a reasonable alternative to such service is available.

The "national transportation policy" cited in this provision requires the Commerce Commission, "in regulating transportation by motor carriers:"

to promote competition and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers and intrastate bus services; (F) provide and maintain commuter bus operations; (G) improve and maintain a sound, safe, and competitive privately owned motor carrier system....

49 U.S.C. § 10101(a)(2).

(e)(1) (pre-1982) objector did or did not meet its burden of proving either that public interest or no-interstate burden justified denial of the continuance, the Commission under the statute is entitled to weigh also the national transportation policy (which includes economic factors), 49 U.S.C. § 10101(a)(2) (quoted in note 9 *supra*), in determining that the public interest in maintenance of the service is outweighed by the economic costs of doing so.

Thus, on the face of the statute, ambiguous though it may be, we cannot say that the Commission's construction of it was not permissible under its terms.

▮▮▮ Where "legislative delegation to an agency on a particular question is implicit rather than explicit ..., a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator," *Chevron U.S.A., Inc., supra,* — U.S. at —, 104 S.Ct. at 2782, and it must uphold the administrative construction even though it is not "the reading the court would have reached if the question initially had arisen in a judicial proceeding," *id.* at n. 11. As summarized in that opinion:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambig-

uously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id.,* — U.S. at —, 104 S.Ct. at 2781–82.[10]

### III. *Legislative History*

In *Pennsylvania Public Utility Commission, supra,* the court found from extensive reference to the legislative history a clear congressional intent contrary to the construction adopted by the Commission and that today we uphold. The Supreme Court's expression in *Chevron, U.S.A., Inc, supra,* might be construed to mean that an administrative construction of a facially ambiguous construction can never be overturned by judicial resort to legislative history from which the court finds legislative intent clearly contrary to that of the administrative construction, although we need not so determine now.[11] For, with great respect for the court that found otherwise in *Pennsylvania Public Utility Commission, supra,* we are unable to find that the present statute presents such a case—although, we must admit, its ascription of legislative intent based upon the legislative interest is a reasonable one.[12]

**10.** In our 1983 en banc decision in *Western Coal, supra,* we had somewhat similarly formulated the test: In considering the Commission's decision, "[w]e begin, as we must, with a recognition of the limited role this Court plays in reviewing an administrative agency's construction of its statutory authority." 719 F.2d at 777. In all such cases, "we must defer to the agency's interpretation of the statute and affirm that interpretation if 'it has a reasonable basis in law.' That the members of this Court might have construed the statute differently is inconsequential." *Id.* (Citations omitted.)

**11.** We suppose, however, that rarely will a court be able to determine such clear congressional intent contrary to the administrative construc-

tion from the shifting sands of legislative history, committee reports, and congressional debates in the enactment of legislation (as the present) that compromises conflicting interests, from which conflicting inferences may plausibly be drawn.

**12.** For instance, support can be found for *Pennsylvania Public Utility's* interpretation as to the determinative importance of the variable-cost-exceeds-revenue test in the senate committee report on its amendments to the House bill, which amendments first introduced the "variable costs" concept, see text *infra*. The Senate's amendments eased the carrier's exit requirements from those originally imposed by the House bill. The report stated: "The exit policy

The legislative history as to the exit provision of § 10935(e) is itself not free from ambiguity. Section 10935 was the product of a legislative compromise. Neither the House version (less favorable to exit) nor the Senate version (permitting relatively easy exit) distinguished between carriers that received their authority before August 1, 1982, and carriers that received their authority after August 1, 1982. Both versions treated all carriers in the same way. The House version, although it provided that *any* (not just on pre-1982 routes) opponent could prevail on *either* the "public interest" *or* the "burden on interstate commerce" test, required the Commerce Commission to consider the factors now contained in (g)(2), (*i.e.*, national transportation policy, subsidy, alternative considerations) under both the "public interest" test and the "interstate commerce" test. House Report No. 334, 97th Cong., 1st Sess. 10–11, 43 (1981); House Conference Report, H.R. Rep. 780, 97th Cong., 2d Sess. 47–48, *reprinted in* 1982 U.S.Code Cong. & Ad. News 2358–59.[13] Nothing in the House version suggests that the Commission was to consider as determinative the relationship between variable costs and revenues. By contrast, the Senate version required the Commission to consider in every case both the relationship between variable costs and revenues and the factors now contained in (g)(2). Senate Report No. 411, 97th Cong., 2d Sess. 25–27 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2332–34. It also required the Commission to grant a discontinuance request unless an objecting party proved that continuing the service would not constitute "an unreasonable burden on interstate commerce." *Senate Report, supra,* at 26, U.S.Code Cong. & Admin.News 1982, at 2333. Such a burden was said to exist "if discontinuance ... of the service [would not be]

consistent with the public interest *and* the interstate and intrastate revenues from the service [would be] adequate to cover the variable costs of operating the service." *Id.* (Emphasis added.)

The compromise version, which was eventually enacted as § 10935(e), sought to reconcile the different emphasis given by the House and Senate as to the exit requirements. The Conference Report describes the compromise version in these terms:

> Same as House bill, except that (1) the Commission must give great weight to the extent to which the carrier's interstate and intrastate revenues on the route to be discontinued are less than the variable costs of providing the transportation on such route; (2) in the case of a route for which interstate authority is granted after August 1, 1982, the Commission shall grant a protested application for discontinuance of or reduction in intrastate service on such route, unless it finds that continuing the service will not constitute an unreasonable burden on interstate commerce; ... The exceptions specified in clauses (2) of the preceding sentence [is] the same as the Senate amendment.

*Conference Report, supra,* at 50, U.S.Code Cong. & Admin.News 1982, at 2361. From this description, as well as the legislative history as a whole, the Commission could reasonably infer that Congress intended for it to consider all of the factors in (g)(1) and (g)(2) in determining whether an objecting party has met its burden under both the "public interest" test and also the "interstate commerce" test of (e)(1)(A).

Contrary to what Texas suggests, the distinction between the burden of proof under (e)(1)(A) and the burden of proof

of the Bus Regulatory Reform Act of 1982 is *grounded* on the *premise* that interstate carriers should be permitted to discontinue service *over routes that do not cover their variable costs."* Senate Report No. 411, 97th Cong., 2d Sess. 25 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad. News 2332 (emphasis added).

**13.** The House version also required the Commission to consider one factor that is not relevant here and that was not included in § 10935, since separate legislation was to be introduced as to it. *See House Report, supra,* at 11 ("whether granting [a discontinuance] petition will have a significant adverse effect on commuter bus operations").

under (e)(2)(A) is not eliminated by the Commission's construction. Under (e)(2)(A) (post-1982 authorizations), if an objecting party fails to prove that revenues exceed variable costs, the objecting party automatically loses. Under (e)(1)(A) (pre-1982 routes), if an objecting party fails in this regard, the objecting party might still prevail since the Commission need only accord "great weight" to the revenues/variable costs factor. The Commission might find, for example, that the elements enumerated in (g)(2) are not served by discontinuing services and that the public interest in maintaining the services outweighs the fact that revenues do not exceed variable costs. In such a case, the Commission is authorized by (e)(1)(A) to deny the carrier's application to discontinue the service.

Thus, even if we concede for present purposes that resort to legislative history was appropriate in this case to resolve a facial ambiguity contrary to the administrative resolution (*but see* note 11 *supra*), the legislative history itself is ambiguous as to the proper construction to be accorded the statutory provisions in question. We defer, for reasons previously stated, to the Commission's permissible construction of them.

### IV. *Due Process*

 Texas raises a further due-process objection to the Commission's adoption of the present construction, contrary to an earlier construction by it that accords with that contended for by Texas. Texas contends, in particular, that the Commission acted impermissibly by adopting the new construction of § 10935 in this case and by not offering a reasoned explanation for doing so. This contention must be evaluated in light of the following rule:

> An agency may change its policies in the course of a specific adjudication, and even apply those policies for the first time to the parties involved. The only restriction upon an agency's discretion to develop policy in this manner is that the agency must adequately explain its departure from the previous policy.

*Missouri-Kansas-Texas Railroad Company v. United States,* 632 F.2d 392, 409 (5th Cir.1980) (citations omitted). *See also Western Coal, supra,* 719 F.2d at 778.

The construction of § 10935 the Commission adopted in this case is different from the construction the Commission had previously adopted in Petition of West Virginia State Lines, Inc. for Review of a Decision of the West Virginia Public Service Commission Pursuant to 49 U.S.C. 10935, Interstate Commerce Commission Decision No. MC–59238 (Sub-No. 74) (Sept. 9, 1984) (*"Virginia Stage Lines I"*). In *Virginia Stage Lines I,* the Commission construed § 10935 in the same way Texas urges us to construe the statute here. As we pointed out in *Missouri-Kansas-Texas Railroad Company, supra,* however, the Commission is free to change its policy so long as the Commission adequately explains its reasons for doing so.

 Texas correctly maintains that the Commission's original decision in this case contains no explanation for the change. Texas received such an explanation, however, when the state petitioned the Commission for a stay of the original decision pending judicial review. In denying the request for a stay, the Commission explained that § 10935, properly construed, requires consideration of all the factors enumerated in §§ 10935(g)(1) & (2) under both the "public interest" test and the "interstate commerce" test. Petition of Greyhound Lines, Inc. for Review of a Decision of the Railroad Commission of Texas Pursuant to 49 U.S.C. 10935, Interstate Commerce Commission Decision, No. MC–1515 (Sub-No. 343) at 5–7 (Feb. 28, 1984). Although "[t]he explanation might have been more complete ... we will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Missouri-Kansas-Texas Railroad Company, supra,* 632 F.2d at 409, *quoting Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.,* 419 U.S. 281,

285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).[14] Such is the case here.[15]

### V. *Other Contentions*

 Texas also contends conclusorily that the Commission's decision is not supported by substantial evidence and is arbitrary and capricious. For the most part, its argument in this regard is based upon its construction of the statutory provisions, which we have rejected. Despite Texas' additional contention to the contrary, we find that substantial evidence supports the Commission's determination that reasonable (rather than merely hypothetical) alternative service was available.

Without detailed explanation, we will simply state that—given its construction of the statute, to which we have deferred—the Commission's findings were supported by substantial evidence and were not arbitrary. "If the agency's findings are supported by substantial evidence and are not arbitrary or capricious, the reviewing court cannot reverse the findings of the agency on the basis that it would have decided the case differently." *Home Health Services of the U.S., Inc. v. Schweiker*, 683 F.2d 353, 356–57 (11th Cir.1982); *see also Glazer Steel Corporation v. Interstate Commerce Commission*, 748 F.2d 1006, 1008 (5th Cir.1984).

### *Conclusion*

For the foregoing reasons, we AFFIRM the order of the Interstate Commerce Commission granting Greyhound's petition to discontinue bus service over one of the company's interstate routes between Houston and San Antonio and at twenty-six off-route points within the state of Texas.

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, concurring:

I join fully in this opinion without abandoning the views expressed in my dissent on the different question presented in *Western Coal Traffic League v. United States*, 719 F.2d 772, 780 (5th Cir.1983).

---

**14.** It may be of interest that, several months after deciding *Virginia Stage Lines I,* the Commission reversed itself in Petition of Virginia State Lines, Inc. for Review of a Decision of the West Virginia Public Service Commission Pursuant to 49 U.S.C. § 10935, Interstate Commerce Commission Decision No. MC–59238 (Sub-No. 74) (March 1, 1984) ("*Virginia Stage Lines II*"). In doing so, the Commission stated that its earlier decision was based on "an inaccurate interpretation of the statute." *Id.* at 3. The construction the Commission adopted in *Virginia Stage Lines II* is identical to the construction the Commission adopted here. The Fourth Circuit subsequently upheld this construction in *Auville v. Interstate Commerce Commission,* 747 F.2d 179 (4th Cir.1984).

**15.** Texas also suggested at one point that it was denied due process because the Commission's construction of § 10935 is unconstitutionally vague. We disagree. The "applicable standard for vagueness is the 'practical criterion of fair notice to those to whom the statute is directed. The particular context is all important.'" *International Society for Krishna Consciousness of Houston, Inc. v. City of Houston, Texas,* 689 F.2d 541, 553 (5th Cir.1982), *quoting, American Communications Association v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 690, 94 L.Ed. 925 (1950). We think the statute provided Texas with fair notice of what the state had to show to meet its burden of proof under § 10935(e)(1)(A). Indeed, at oral argument, Texas acknowledged it would have introduced the same evidence regardless of which of the two constructions was adopted.